681 F.2d 1203
 69 A.L.R.Fed. 284, 1982-2 Trade Cases 64,878
 BETASEED, INC., Plaintiff-Appellant,
v.
U AND I INCORPORATED, Defendant-Appellee.
U AND I INCORPORATED, Counterclaimant, Cross-Appellant,
v.
BETASEED, INC., Washington Sugar Beet Growers Association,
the members andaffiliates of the Washington Sugar Beet
Growers Association, Does 1 to 1500, inclusive,
Counterclaim-Defendants, Cross-Appellees.
 Nos. 80-3490, 80-3514.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 5, 1982.
Decided July 23, 1982.
 
 Peter S. Hendrixson, Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, Minn., for plaintiff-appellant.
 Michael H. Salinsky, Pillsbury, Madison & Sutro, San Francisco, Cal., for U and I Inc.; Parker A. Maddux, San Francisco, Cal., on brief.
 Appeal from the United States District Court for the Eastern District of Washington.
 Before KILKENNY, ANDERSON and ALARCON, Circuit Judges.
 ALARCON, Circuit Judge:
 
 
 1
 These appeals present, in the context of a private antitrust lawsuit, the familiar issue of whether the district court properly granted the parties' respective motions for summary judgment. In its complaint, Betaseed, Inc., alleges that U & I Inc. violated the Sherman Act's proscription against tying arrangements, reciprocal dealings, and monopolization. 15 U.S.C. §§ 1, 2. Betaseed also charges that U & I committed the common law torts of disparagement and interference with contractual relations. By counterclaim, U & I charges that Betaseed and the Washington Sugar Beet Growers Association (WSBGA) conspired to fix the price of sugar beet seed in the Washington seed market.
 
 
 2
 Betaseed moved for summary judgment on its tie-in/reciprocal dealing claim and on U & I's price-fixing counterclaim. The WSBGA also moved for summary judgment on U & I's counterclaim. U & I moved for summary judgment on all counts of Betaseed's complaint. The district court denied Betaseed's motion for summary judgment on its tie-in/reciprocal dealing claim and granted Betaseed's motion for summary judgment on U & I's price-fixing counterclaim. The district court also granted U & I's motion for summary judgment on all of Betaseed's antitrust and common law claims. The basis for this ruling was that U & I's actions were justified by legitimate business objectives and that U & I acted in a manner which had the least restrictive impact on competition. The district court also concluded that, since U & I could not prove any antitrust injury or damages and U & I's counterclaim did not state an antitrust complaint, the claim was not sustainable as a matter of law. Both parties appeal the district court's rulings.[1]
 
 
 3
 We affirm the district court's judgment as to U & I's counterclaim for price-fixing. We reverse the judgment on Betaseed's claims because there are disputed facts material to Betaseed's claim for relief and to U & I's asserted business justification defense and we are unable, after viewing the record in a light most favorable to Betaseed, to conclude that U & I is entitled to judgment as a matter of law.
 
 I. STANDARD FOR REVIEW
 
 4
 As a general rule summary judgment is disfavored in complex antitrust litigation, particularly where extensive factual determinations must be made with respect to the issues of intent and motive. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); Beltz Travel Service, Inc. v. International Air Transport Ass'n., 620 F.2d 1360, 1364-65 (9th Cir. 1980).
 
 
 5
 It is clear, however, that this general reluctance does not preclude the use of summary judgment in antitrust litigation. Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc., 637 F.2d 1376, 1381 (9th Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981). Summary judgment is appropriate in the following instances: (1) "In the absence of 'any significant probative evidence tending to support the complaint' ", First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968) and; (2) when the moving party has shown that there is no genuine issue of material fact and, upon viewing the evidence and factual inferences drawn therefrom in a light most favorable to the non-moving party, it is evident that the moving party is entitled to judgment as a matter of law. Program Engineering, Inc. v. Triangle Publications, Inc., 634 F.2d 1188, 1192-1193 (9th Cir. 1980).
 
 II. FACTS
 A. Undisputed Facts
 
 6
 Betaseed, a Minnesota corporation, and U & I, a Utah corporation, sell sugar beet seeds to growers, including Washington farmers. Betaseed sells only sugar beet seeds; U & I sells seeds and buys sugar beets for processing sugar. U & I is the only processor of sugar beets in the relevant geographic area due to freight barriers rendering impractical the shipment of Washington beets outside this area. Each year, U & I enters into contracts with individual Washington sugar beet growers for the purchase of sugar beets. The terms of these contracts are annually negotiated and agreed to by U & I and the Washington Sugar Beet Growers Association (WSBGA), whose membership comprises eighty to ninety percent of Washington sugar beet growers. Prior to 1972, U & I was the sole supplier of sugar beet seed; the WSBGA-approved sugar beet purchase contracts provided that sugar beet growers could use only U & I seed. The 1972, 1973, and 1974 contracts did not contain any seed restriction. These contracts contained a skewed scale of payment in which U & I over paid growers whose sugar beets "had a below average sugar content and under paid growers whose beets had an above average sugar content."[2] It was described as a type of insurance for growers who had bad years.[3]
 
 
 7
 In 1972, Betaseed introduced its HH7 and HH22 sugar beet seeds into the Washington sugar beet seed market. According to Kent Nielsen, U & I's geneticist, this was the "first time (the industry was) faced with an apparently bonifide (sic) attempt by an independent seed company, (independent of a sugar beet processing company) to sell sugar beet seed to sugar beet growers throughout the United States on a continuing basis."[4]
 
 
 8
 From 1972 to 1976, Betaseed's sugar beet seed sales steadily increased.[5] In 1973, U & I fieldmen began monitoring the amount of acreage planted with Betaseed's seeds and reporting their findings to U & I's agricultural superintendents.[6] In 1975, U & I's sugar beet purchase contracts contained the following restriction:
 
 
 9
 The grower shall grow, during the year 1975, -- acres of sugar beets and shall sell the entire crop therefrom to the COMPANY, and the COMPANY shall buy and pay for the same upon the terms and conditions hereinafter set forth. It is further agreed that sugar content, disease susceptibility, processability, purity, and ability to retain quality under storage are with other characteristics necessary to qualify the beets which COMPANY is obligated to buy under his contract, COMPANY therefore will only be obligated to buy beets grown from Utah-Idaho Sugar Company seeds number Hybrid 3 and 8 or such other seed as has been established by tests satisfactory to the COMPANY to produce beets having substantially the same characteristics as beets produced from said number 3 and 8 seed mentioned above. (emphasis added).
 
 
 10
 In 1976, U & I offered an "alternate contract" which the WSBGA refused to approve. According to this contract, growers could use other companies' seed but would be paid less for these sugar beets than under the "regular" or WSBGA approved contract.[7]
 
 
 11
 The parties draw different inferences from these facts and refer to additional facts to support their respective positions. We next examine these facts.
 
 1. U & I's Rationale for the Restriction
 
 12
 U & I maintains that the seed restriction clause was necessary because Betaseed's seeds are inferior to U & I's seeds in terms of sugar content. The purchase of these beets under the regular contract would, in U & I's view, lead to financial ruin since U & I would have to pay more for such beets. U & I nevertheless did not enforce the seed restriction in 1975 because, according to Keith Wallentine, Vice President of U & I's corporate relations, Betaseed had not submitted data on its seed, and U & I's tests on Betaseed's seed were "not conclusive."[8] U & I adopted the provision in 1975, according to Wallentine, because "it was becoming apparent that beets grown from Betaseed seed tended to have lower sugar content on (the) average than beets from U & I seed" and because in 1975 the contract was changed so that U & I assumed all the risk of "loss of quality of beets while in storage."[9] Wallentine also asserted that, after the 1975 sugar beet crop had been harvested, two U & I receiving stations in Washington had sugar beets with lower sugar content than at other stations in the same area. Investigation of the situation by U & I employees "uncovered facts indicating that certain growers who had delivered beets to those stations had planted substantial amounts of Betaseed seed."[10]
 
 2. The 1976 Documents
 
 13
 Betaseed maintains that the sequence of events as demonstrated by U & I documents indicates that the true purpose of the seed restriction, enforced in 1976, was to eliminate seed competition. A summary of the documents follows.
 
 
 14
 On February 5, 1976, Wallentine distributed to various U & I officials material from U & I's research department concerning studies of U & I seed and seed of other companies. Wallentine invited them to "examine it preliminary to the meeting to be held for development of (U & I) policy on use of seed from sources outside (U & I's) company." The materials contain: (1) a summary of the comparative qualities of U & I hybrid 8 seed and Betaseed HH22 seed;[11] (2) tables listing the economic and time factors in developing sugar beet varieties with improved agronomics, processing, and storage characteristics, including the potential profit from the sale of sugar beet seed;[12] and a summary describing U & I 8 as "probably the best all around hybrid for use in the U & I sugar beet growing area."[13] The author of the report concludes that while U & I 8 seed is probably the best, "competition from other seed sources is keen and unless improved varieties are developed substantial acreage will be lost to other varieties."[14] In addition to noting that this loss would result in a fall of profits due to lower seed sales, the author asserts that it would cause reduced mill efficiency because "competing seed concerns are not likely to be concerned with the processing quality of the sugar beet." The author concludes optimistically that "(f)ortunately improved varieties are forthcoming," but warns that "a continued strong program is needed to maintain and hopefully improve our competitive position in variety development."[15]
 
 
 15
 On February 11, 1976, U & I sent a letter to all sugar beet growers informing them that because no scientific data for non-U & I seed had been received by U & I, U & I would limit its 1976 purchase of sugar beets to only those beets grown from U & I seed (U & I 3 and U & I 8) "until such time as it is demonstrated by tests to the Company's satisfaction that other beet seeds possess as good or better characteristics as the Hybrids Three and Eight."[16] On February 13, 1976, Kent Nielsen, U & I's manager for Agricultural Research, sent a letter to U & I's fieldmen, agricultural superintendents, and district managers criticizing Betaseed's HH22 seed as compared to U & I's 8 seed.[17] The letter also indicated recent improvements in U & I's seed.[18]
 
 
 16
 On February 25, 1976, Gene Peterson, U & I's general agricultural superintendent, wrote to Duane Melling, Betaseed's president, informing him that U & I could not accept Betaseed's seed because the test data submitted by Betaseed confirmed U & I's analysis that Betaseed's seed provided higher tonnage at the expense of lower recoverable sugar. Peterson explained that under the terms of sugar beet purchase contract, beets grown from Betaseed's seed did not substantially satisfy U & I's economic and contractual requirements relating to sugar content, storage, processing, handling, sugar recovery, transporting and disease susceptibility to the same extent as did U & I's seeds. Peterson also asserted that when U & I negotiated the 1976 contract, the agreement "centered around a specific scale of payments between levels of sugar content."[19] The increments between levels of sugar content in that scale, according to Peterson, did not compensate for the extra cost of handling, transporting, and processing beets with lower sugar content.
 
 
 17
 On March 8, 1976, U & I sent a letter to Washington sugar beet growers informing them that U & I had drafted an alternate agreement with an adjusted scale of payment "to reflect the characteristics of Betaseed's seed," and that U & I would accept beets grown from Betaseed under this contract.[20] The scale of payment for sugar beets under the "alternate contract" was lower than that of the "regular contract." The WSBGA refused to approve the alternate contract. Subsequently, U & I sent the growers another letter stating that the WSBGA had threatened to enjoin U & I from using this contract and, if it successfully did so, the agreement would be void. None of the growers contracted with U & I pursuant to this alternate contract. Each of the growers who had ordered all of their seed from Betaseed-a total of $287,675.00 worth of seed-cancelled their orders.[21]
 
 B. Disputed Facts
 
 18
 Betaseed's antitrust and common law tort claims are based upon the seed restriction clause and the "alternate" contract. Betaseed maintains that the seed restriction clause, which permits use of other companies' seeds if they are satisfactory to U & I, is in fact an illusory seed specification clause for two reasons: first, it lacks objective standards to determine whether other companies' seeds are acceptable and second, U & I never approved any seed under the regular contract except its own varieties. Betaseed also complains that the "alternate" contract was an equally empty gesture since U & I knew that, without WSBGA approval of the contract, growers would not enter into this contract. Betaseed also maintains that U & I drafted the alternate contract so that it was not as desirable to growers as the regular contract. Under the alternate contract, U & I would pay growers less money for sugar beets grown from Betaseed seed than for those grown from U & I seed pursuant to the regular contract. Betaseed charges that U & I's actions were primarily motivated by an anticompetitive intent.
 
 
 19
 U & I asserts that its actions were justified by legitimate business objectives because the WSBGA refused to change or unskew the regular contract's skewed scale of payment. U & I based this scale on the predictable genetic characteristics of U & I seed. U & I argues that since the regular contract's skewed scale required U & I to pay more for sugar beets with low sugar content, the purchase of sugar beets grown from seed that produced low sugar content beets would have caused U & I financial ruin. Thus, U & I maintains, the seed restriction clause and the alternate contract were the only alternatives available to accomplish the legitimate business objective of profitably maintaining its sugar beet processing factory.
 
 
 20
 Betaseed disputes the following factual assertions underlying U & I's defense: (1) that U & I's seed consistently demonstrated genetic characteristics upon which U & I could rely in adopting the skewed scale of payment; (2) that U & I could not obtain a change in the payment scale; (3) that under the skewed scale U & I would suffer financial ruin if it had purchased sugar beets grown from Betaseed's seed; (4) that Betaseed's seed is inferior to U & I's seed; and (5) that the seed restriction clause and the alternative contract were the only means available to U & I to achieve its business objective of profitably maintaining its business. The following summary of documents demonstrates the dispute.
 
 1. The Skewed Payment Scale
 
 21
 Betaseed maintains that neither the seed specification clause nor the non-WSBGA approved alternative contract can excuse the fatal condition in the sugar beet purchase contract that in fact required growers to use U & I seed. Betaseed argues that U & I had available to it a method of accomplishing its business objective that would have had a less restrictive impact on the competitive process-a method that U & I had used in areas where it had competition from other sugar beet processors-purchasing sugar beets grown from any seed, including Betaseed's seed, pursuant to an unskewed scale of payment.
 
 
 22
 U & I acknowledges that, in Utah and Idaho, it purchased sugar beets grown from Betaseed's HH22 and HH7 seeds according to an unskewed scale of payment. U & I asserts that this procedure was not available in Washington, because the WSBGA would not agree to an unskewed scale of payment, although U & I had repeatedly requested such a change since 1972.[22]
 
 
 23
 Betaseed disputes this assertion first by pointing to evidence that U & I did not ask for a change in the payment scale until 1976,[23] although it had adopted the seed restriction clause in 1975. Second, Betaseed points to notes of the 1977 contract negotiations that indicate the skewed payment scale was retained in those contracts in exchange for WSBGA's recommendation for the use of U & I's seed.[24] Third, Betaseed refers to U & I's agreement in 1978 to not change the scale in order to obtain an increase in the amount of acreage to be delivered to a particular factory.[25] Fourth, Betaseed challenges U & I's good faith negotiations by comparing the present situation to the past. U & I successfully obtained an unskewed scale by increasing the increment in the price paid for beets for each extra percentage point of sugar in the beet.[26]
 
 
 24
 Betaseed also disputes U & I's contention that it adopted the skewed scale only because it knew and was able to rely upon the genetic characteristics of sugar beets grown from its seed. In this respect, Betaseed points to the test results revealing substantial differences between different entries of U & I seed in the same test-the most significant being sugar percentage.[27] Betaseed also asserts that these differences show that U & I's seed specification clause, which permits the use of other companies' seed if it is substantially the same as U & I seed, is illusory because these companies would not know which U & I test result should be used as a comparison or basis for approval.
 
 2. Inferiority of Betaseed's Seed
 
 25
 Whether U & I 8 is superior to Betaseed HH22 or HH7 in terms of sugar content is disputed by both parties' experts. U & I's expert, Dr. Nielsen, concludes that beets grown from U & I seeds consistently and to a statistically significant degree have a higher sugar content than beets grown from Betaseed's HH22 seed, although the differences between U & I seed and Betaseed HH7 are not as consistent and not as frequently statistically significant. U & I maintains that tests from Betaseed confirm its initial results that U & I's seeds produce beets with higher sugar content than Betaseed seeds. According to the calculations of U & I's finance officer, U & I would have lost substantial profits had it accepted, pursuant to the regular contract's skewed scale, beets grown from Betaseed seed. Betaseed's expert, Dr. Stander, refutes the fact that U & I would have lost substantial profits had it accepted beets grown from Betaseed's seeds.
 
 
 26
 According to Stander's calculations, beets from HH22 would be less valuable by 11 cents per ton than beets from U & I 8 seed, while beets from HH7 would be 75 cents more valuable per ton than U & I 8 seed. He calculated that pursuant to the regular contract, U & I would underpay growers who used HH22 by $1.79 per ton rather than over pay $1.66 per ton as U & I's expert calculated. Similarly, HH7 would yield a $1.23 underpayment as compared to U & I 8. Stander concluded that U & I would have gained $1,676,032 if it had purchased all beets grown from HH22 seed, while Whipple, U & I's finance officer, concluded that U & I would have lost $2,791,692. Stander also asserted that U & I would have gained $192,626 had it purchased HH7 beets.
 
 
 27
 The affidavits of Stander and Nielsen also conflict as to whether dissimilarities between different years of U & I's own seed are statistically significant. Stander criticized Whipple's calculations as to U & I 8 seed because they assumed a very constant and predictable pattern of results from U & I seed, which did not conform to the realities of the situation. Finally, Stander concluded that, based on the differences in the various years' seed production of HH22 and because one could not know what year's seed production of U & I 8 was being used in comparison, he could not state with certainty that U & I 8 contained a greater sugar percentage than HH22. That answer, he noted, depends on many variables. He also concluded that there is no statistical difference in sugar content between HH7 and U & I 8, and that in the 1975 and 1976 tests conducted by Dr. Theurer for the Department of Agriculture, U & I 8 performed relatively low compared to the other entries.
 
 
 28
 Betaseed also points to evidence that its HH7 seed was acceptable to U & I under the regular contract yet U & I never approved the variety.[28] Although U & I 8 is the basis for comparison by the experts, the contract specification does not state which seed's characteristics, U & I 8 or U & I 3, are to be the basis for comparing and approving other companies' seeds.
 
 III. THE PER SE CLAIM
 A. Antitrust Classification
 1. Tying Arrangement
 
 29
 Tying arrangements, which involve a seller's refusal to sell one product (the tying product) unless the buyer also purchases another (the tied product) are presumptively illegal if certain elements exist. Northern Pacific Railroad Co. v. United States, 356 U.S. 1, 5-6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). These elements are: 1) there must be in fact a tying arrangement between two distinct products or services; 2) there must be some modicum of coercion shown-that is a showing of an onerous effect on an appreciable number of buyers coupled with a demonstration of sufficient economic power in the tying market; 3) the defendant must have sufficient economic power in the tying market to impose significant restrictions in the tied product market; and 4) the amount of commerce in the tied product market must not be insubstantial. Moore v. Jas. H. Matthews & Co., 550 F.2d 1207, 1212, 1216-17 (9th Cir. 1977).
 
 
 30
 Once these are demonstrated, no specific showing of unreasonable anticompetitive effect is needed. Moore v. Jas. H. Matthews & Co., 550 F.2d 1207 (9th Cir. 1977). The tying per se rule, however, "is exceptional in that it permits the defendant to offer justifications for undertaking the tie (citations). A tie-in may be justified if it is implemented for a legitimate purpose and if no less restrictive alternative is available (citations)." Phonetele, Inc. v. American Telephone and Telegraph Company, 664 F.2d 716, 738-39 (9th Cir. 1981). The defendant has the burden of showing that the tie-in was reasonable for the entire time it was in effect. Id. at 739.
 
 
 31
 In Moore, this court discussed at length the rationale for the per se presumptive illegality of tie-ins; the rationale is premised upon the leverage theory. 550 F.2d at 1212-1213. Competitors are denied free access to the tied market product, not because the party imposing the arrangement has a superior product, but rather because of the power of leverage exerted by the tying product. By conditioning the sale of one commodity on the purchase of another, "a seller coerces the abdication of the buyers' independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the market." Northern Pacific Railroad Co. v. United States, 356 U.S. at 10, 78 S.Ct. at 521. "Tying arrangements serve hardly any purpose beyond the suppression of competition(,)" Standard Oil Co. of California v. United States, 337 U.S. 293, 305-06, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949) because the non-anticompetitive purpose "can be adequately accomplished by other means much less inimical to competition." Northern Pacific Railroad Co., 356 U.S. at 6 n.5, 78 S.Ct. at 518 n.5 (citations omitted).
 
 
 32
 Betaseed maintains that U & I's sugar beet purchase contracts, both prior to and after March 8, 1976, constituted illegal per se tying arrangements. These contracts provided that U & I would purchase sugar beets grown only from U & I seed or other seed that had been established by tests satisfactory to U & I to produce beets having substantially the same characteristics as beets produced by U & I seed. Betaseed argues that these contracts violate section 1 of the Sherman Act, 15 U.S.C. § 1, because U & I, the only sugar beet processor in Washington and the sole purchaser of sugar beets grown in Washington, never approved any other seed under this contract.
 
 2. Coercive Reciprocal Dealing
 
 33
 Betaseed acknowledges that U & I's sugar beet purchase contract is not the prototype of a tie-in and is more properly characterized as a "reciprocal dealing"-a dealing in which two parties face each other as both buyer and seller and one party agrees to buy the other party's goods on condition that the second party buys other goods from it. Spartan Grain & Mill Co. v. Ayers, 581 F.2d 419, 424 (5th Cir. 1978), cert. denied, 444 U.S. 831, 100 S.Ct. 59, 62 L.Ed.2d 39 (1979). The spectrum of the practice-which, in essence, provides that if you buy from me, I'll buy from you-extends from the use of overt coercion to the use of a mutual patronage arrangement. United States v. General Dynamics Corporation, 258 F.Supp. 36, 57 (S.D.N.Y.1966). Coercive reciprocity presupposes the existence of economic leverage in one market to gain an unfair advantage in another, while mutual reciprocity occurs when both parties stand on equal footing with respect to purchasing power yet they agree to purchase from one another. Id. at 59;[29] Comment, A Re-evaluation of Reciprocal Dealings Under the Federal Antitrust Laws: Spartan Grain & Mill Co. v. Ayers, 11 Loy.U.Chi.L.J. 577, 597 (1980).
 
 
 34
 Relying on Spartan Grain & Mill Co. v. Ayers, 581 F.2d 419 (5th Cir. 1978), cert. denied, 444 U.S. 381, 100 S.Ct. 59, 62 L.Ed.2d 39 (1979), Betaseed argues that this court should judge the coercive reciprocal dealing contracts at bar according to the legal standards applied to tie-ins. In Spartan Grain, the Fifth Circuit reasoned that tie-ins and reciprocal dealings should be analyzed alike because both arrangements have the same substantial anticompetitive effect: the use of economic power in one market to restrict competition in another market.
 
 
 35
 Although this circuit has had occasion to discuss and apply the per se tie-in standard, see, e.g., Hirsh v. Martindale-Hubbell, Inc., 674 F.2d 1343 (9th Cir. 1982); Krehl v. Baskin Robbins Ice Cream, 664 F.2d 1348 (9th Cir. 1982); Phonetele, Inc. v. American Telephone and Telegraph Co., 664 F.2d 716 (9th Cir. 1981); Moore v. Jas H. Matthews Co., 550 F.2d 1207 (9th Cir. 1977); and Siegel v. Chicken Delight, Inc., 448 F.2d 43 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972), we have not yet addressed the interface of tie-ins and coercive reciprocal dealings and whether they should be judged by the same standard. For the reasons explained more fully in the analysis that follows, and because we believe the challenge restraint here fits within the tie-in per se category, see Gough v. Rossmoor, 585 F.2d 381, 386 (9th Cir. 1978), cert. denied, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979), we agree with the reasoning of the Fifth Circuit in Spartan Grain & Mill Co. v. Ayers, 581 F.2d 419, cert. denied, 444 U.S. 831, 100 S.Ct. 59, 62 L.Ed.2d 39 (1979) that because the labels tie-in and coercive reciprocal dealing refer to similar phenomena, coercive reciprocal dealings should be judged according to the standards applied in a per se tie-in analysis.[30] Since we hold that there are material and genuine disputed facts as to a factual pattern of coercive reciprocity, our discussion is limited to coercive reciprocal dealings.
 
 
 36
 (a) Analysis
 
 1. Spartan Grain
 
 37
 In Spartan Grain, the Fifth Circuit considered, in the context of the chicken broiler industry, a reciprocal dealing arrangement between Spartan Grain, a feed merchant, and various producers of chicken broilers. Prior to analyzing the challenged business practice, the court examined, from an historical perspective, the chicken broiler industry. In the early years of the industry, the various stages of production were handled by different business entities. After World War II, the industry began integrating the production process so that those involved in the stages of production lost their independence. Spartan Grain was a feed merchant, operating on a non-integrated basis. Its markets for feed were slowly disappearing as other feed merchants increased their control over producers and growers through integration. The producers in Spartan raised egg-laying chickens both on a contract basis and on an independent basis. Under either system, the producers would only buy chickens when someone was committed to buying their eggs, thus guarding against the risk that the eggs could not be marketed.
 
 
 38
 When the broiler industry fell into disarray, leaving no guaranteed markets for the producer's eggs on either a contract or independent basis, Spartan Grain introduced its own form of contractual integration. It negotiated with certain broiler hatcheries for commitments to take eggs and arranged for primary breeders to produce flocks of laying chicks. Spartan Grain then offered these flocks to various producers, guaranteeing that it would buy the eggs and sell them to the already committed hatcheries. Spartan offered this program to producers on the condition that they buy only Spartan Grain's feed.
 
 
 39
 Spartan Grain later commenced legal action against four producers who had joined the program but had failed to pay the balance on their feed accounts. These producers asserted antitrust counterclaims, charging that Spartan Grain illegally tied the sale of feed to both the sale of chickens and the purchase of eggs. The producers also characterized the arrangement as a reciprocal dealing.
 
 
 40
 The court noted that the transactions at issue in the case could be characterized as either a reciprocal dealing or a tie-in. The reciprocal arrangement involved Spartan Grain's purchase of eggs from producers on the condition that the producers buy its feed. The tie-in resulted where Spartan Grain arranged for the producers to buy flocks as well as feed. The court declined to shape the arrangement to fit either label because the arrangement could fit either label and because the two labels refer to similar phenomena:
 
 
 41
 In each case one side of a transaction has special power in the market place. It uses this power to force those with whom it deals to make concessions in another market. In tying arrangements, a seller with economic power forces the purchaser to purchase something else to abstain the desired item. In reciprocal dealings a buyer with economic power forces a seller to buy something from it to sell its goods. In both cases, the key is the extension of economic power in one market to another market.
 
 
 42
 581 F.2d at 425.
 
 
 43
 Applying the per se tie-in standards set forth in Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), the court concluded that there could be no per se liability. Although a substantial amount of commerce was involved, the producers had failed to show that Spartan Grain had sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product.
 
 2. Pre-Spartan Grain Precedent
 
 44
 The Fifth Circuit's approach to determining that reciprocal dealings come within the ambit of the per se classification is not without precedent. Courts and commentators have analogized reciprocal dealings to tie-in arrangements. E.g., Columbia Nitrogen Corp. v. Royster Co., 451 F.2d 3, 13 (4th Cir. 1971); Ryals v. National Car Rental System, Inc., 404 F.Supp. 481, 486 (D.Minn.1975); United States v. General Dynamics Corp., 258 F.Supp. 36, 65 (S.D.N.Y.1966). Comment, A Re-evaluation of Reciprocal Dealings Under the Federal Antitrust Laws: Spartan Grain v. Mill Co. v. Ayers, 11 Loy.U.Chi.L.J. 577, 596-98 (1980). Handler, Emerging Antitrust Issues: Reciprocity, Diversity and Joint Ventures, 49 Va.L.Rev. 433, 437 (1967); Hausman, Reciprocal Dealing and the Antitrust Laws, 77 Harv.L.Rev. 873, 883-84 (1964). In dicta, the Eighth and Third Circuits have observed that certain types of reciprocity are per se anticompetitive practices that violate the antitrust laws. E.g., Battle v. Lubrizol Corp., 673 F.2d 984, 987 (8th Cir. 1982) (quoting Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164 (3d Cir. 1979)). In Columbia Nitrogen, the Fourth Circuit, also in dictum, noted that coercive reciprocity has long been recognized as an anticompetitive practice that violates the antitrust laws. 451 F.2d at 14 n.17.[31] Recently, the First Circuit upheld a dismissal of a complaint alleging a section one Sherman Act violation because there was no suggestion that the defendant's termination of plaintiff as defendant's builder-dealer was " 'exercised in furtherance of an unlawful arrangement with others-such as a tie-in arrangement, (or) reciprocal dealing arrangement, ...' " Gilbuilt Homes, Inc. v. Continental Homes of New England, 667 F.2d 209, 210 (1st Cir. 1981) (quoting ABA, Antitrust Law Developments, 20 (1975)).
 
 
 45
 The earliest reciprocal dealing cases involve the Federal Trade Commission's attack on the practice as an unfair method of competition. E.g., In re California Packing Corp., 25 F.T.C. 379 (1937) (large diversified food processing company used its purchasing power and freight volume to require suppliers and transport companies to patronize its subsidiary terminal corporation); In re Mechanical Mfg. Co., 16 F.T.C. 67 (1932) (large meat packing firm with vast power as major railroad shippers acquired control of minor manufacturers of railroad equipment; during later negotiations with railroads, the firm indicated that unless railroads purchased equipment from the manufacturers controlled by the meat firms, their dealings with the railroad would be reduced); In re Waugh Equip. Co., 15 F.T.C. 232 (1931) (same).
 
 
 46
 In F.T.C. v. Consolidated Foods Co., 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965), the Supreme Court first discussed the anticompetitive effects of reciprocity in the context of a Clayton Act challenge to a corporate merger.[32] Consolidated Foods, an owner of processing plants and a network of wholesale and retail food stores, had acquired Gentry, Inc., a manufacturer of dehydrated onion and garlic. Due to the threat of reciprocal buying and the power to foreclose competition, the FTC issued an order of divestiture.
 
 
 47
 In reviewing the order, the Supreme Court held "at the outset" that reciprocity made possible by such an acquisition is "one of the congeries of anticompetitive practices at which the antitrust laws are aimed." 380 U.S. at 594, 85 S.Ct. at 1222. The court reasoned that the practice "results in 'an irrelevant and alien factor,' (citation), intruding into the choice among competing products, ..." Id. In reaching the conclusion that the FTC's order of divestiture was supported by substantial evidence the Court quoted, with approval, the FTC's rationale: " 'If reciprocal buying creates for Gentry a protected market, which others cannot penetrate despite superiority of price, quality, or service, competition is lessened ....' " 380 U.S. at 599, 85 S.Ct. at 1224.
 
 
 48
 Relying on Consolidated Foods, lower federal courts have concluded that reciprocity may violate §§ 1 and 2 of the Sherman Act. See, e.g., Ryals v. National Car Rental System, Inc., 404 F.Supp. 481, 485-86 (D.Minn.1975) (court agreed that reciprocal dealing is antitrust violation, but found no violation because only one product was involved in the case; thus, plaintiffs failed to allege facts establishing reciprocity in fact); W. L. Gore & Associates, Inc. v. Carlisle Corp., 381 F.Supp. 680, 703 (D.Del.1974), aff'd in part and rev'd in part, 529 F.2d 614 (3d Cir. 1976) (court stated that reciprocal dealing could violate §§ 1 and 2 of the Sherman Act but facts of case-threatened use of reciprocity-supported only an attempt to monopolize § 2 claim; on appeal, the Third Circuit affirmed in part but reversed on the antitrust claim because it found the facts insufficient to state a claim, although the court agreed with the legal principles 529 F.2d at 624). United States v. General Dynamics Corp., 258 F.Supp. 36, 59, 65-67 (S.D.N.Y.1966) (court stated that both mutual and coercive reciprocity violated § 1 of the Sherman Act; court found no violation because government failed to prove that a substantial amount of commerce was involved).[33]
 
 3. Impact on Competition
 
 49
 The rationale for invoking the presumption of illegality in tie-ins-their pernicious effect on competition and lack of redeeming procompetitive virtues-applies with equal force to coercive reciprocal dealings.
 
 
 50
 The Supreme Court has indicated that whether a court invokes a per se or rule of reason analysis, the purpose of the analysis is to form a judgment about the competitive significance of the restraint. National Society of Professional Engineers v. United States, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). In characterizing conduct under the per se rule, the focus of our inquiry must be on whether the effect and the purpose of the practice "are to threaten the proper operation of our predominantly free-market economy-that is, whether the practice facially appears to be one that always or almost always tend (sic) to restrict competition and decrease output, ... or instead (is) one designed to 'increase economic efficiency and render markets more, rather than less, competitive.' " Broadcast Music, Inc. v. CBS, 441 U.S. 1, 19-20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979) (quoting United States v. Gypsum Co., 438 U.S. 422, 441 n.16, 98 S.Ct. 2864, 2875 n.16, 57 L.Ed.2d 854 (1978)). Accord, Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 53 n.21, 97 S.Ct. 2549, 2559 n.21, 53 L.Ed.2d 568 (1977) (antitrust policy divorced from market considerations would lack any objective bench marks).
 
 
 51
 Coercive reciprocity adversely impacts on competition in a manner similar to tie-ins. First, it erodes the traditional purchasing criteria of price, quality, and service. By conditioning the sale (tie-in) or purchase (coercive reciprocity) of one commodity on the purchase (tie-in) or sale (coercive reciprocity) of another, a seller (or buyer) "coerces the abdication of (the customers') independent judgment as to the 'tied' (or second) product's merits and insulates it from the competitive stresses of the open market." Times-Picayune v. United States, 345 U.S. 594, 605, 73 S.Ct. 872, 878, 97 L.Ed. 1277 (1953). See also, Northern Pacific Railroad Co. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (tying arrangements force buyers to forgo their free choice between competing products). Coercive reciprocity "results in 'an irrelevant and alien factor,' (citation), intruding into the choice among competing products, creating at the least 'a priority on the business at equal prices.' " FTC v. Consolidated Foods Corp., 380 U.S. 592, 594, 85 S.Ct. 1220, 1221, 14 L.Ed.2d 95 (1965) (quoting International Salt Co. v. United States, 332 U.S. 392, 397, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947); Northern Pacific Railroad Co. v. United States, 356 U.S. 1, 3, 6, 12, 78 S.Ct. 514, 517, 518, 521, 2 L.Ed.2d 545).
 
 
 52
 Second, coercive reciprocity forecloses from a particular market those competitors of the buyer-seller who are without market leverage. See Northern Pacific Railroad Co., 356 U.S. at 6, 78 S.Ct. at 518; International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947). As with the tying arrangement, coercive reciprocity denies "competitors free access to the market" for the product, not because of a better product or a lower price but because of "power or leverage in another market." Northern Pacific Railroad Co., 356 U.S. at 6, 78 S.Ct. at 518. Moreover, market entry by potential competitors will be discouraged when it is known that economic leverage, rather than marketing quality and efficiency, will produce business. Comment, A Re-evaluation of Reciprocal Dealings Under the Federal Antitrust Laws: Spartan Grain & Mill Co. v. Ayers, 11 Loy.U.Chi.L.J. 577, 583 (1980); Hausman, Reciprocal Dealing and the Antitrust Laws, 77 Harv.L.Rev. 873, 879-80 (1964). Potential competitors may be required to enter simultaneously two separate product markets. Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 513, 89 S.Ct. 1252, 1263, 22 L.Ed.2d 495 (1969) (Fortner I) (White, J., dissenting). Thus, in coercive reciprocity as in tying arrangements, the effect on competitors attempting to rival the tied product is "drastic: to the extent the enforcer of the tying arrangement (or the coercive reciprocal dealing practice) enjoys market control, other existing or potential sellers are foreclosed from offering up their goods to a free competitive judgment; they are effectively excluded from the marketplace." Times-Picayune, 345 U.S. at 605, 73 S.Ct. at 878.
 
 
 53
 Third, coercive reciprocity creates oligopolistic and monopolistic industries inimical to the national economy. Comment, A Re-evaluation of Reciprocal Dealings Under the Federal Antitrust Laws: Spartan Grain & Mill Co. v. Ayers, 11 Loy.U.Chi.L.J. 577, 582-83 (1980). Market leverage in one company increases to the detriment of competitors; consequently, the market structure becomes more concentrated and the number of competitors becomes fewer. A single party within the market is benefited at the expense of viable business competition within that market.
 
 
 54
 In our view, the malevolent economic results of market foreclosure and raising of artificial entry barriers in a market tinged with coercive reciprocity evinces the anticompetitive and predatory nature of the practice. The similarity between coercive reciprocity and tying arrangements, both in form and in anticompetitive consequences, leads to the conclusion that the two practices should be judged by similar standards. Coercive reciprocity, in our view, is a form of tying and hence "fits" this category. See Gough v. Rossmoor Corp., 585 F.2d 381, 386 (9th Cir. 1978), cert. denied, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979) (this court stated that the first question to be answered is whether the restraint fits any of the four per se categories: horizontal and vertical price-fixing; horizontal market division; group boycotts or concerted refusals to deal; and tie-in sales).
 
 B. Application of the Per Se Analysis
 1. Coercion
 
 55
 U & I does not dispute that it had sufficient economic power in the tying product market to restrain appreciably the tied product market or that the amount of interstate commerce affected is not insubstantial.[34] Rather, U & I maintains that, in fact, there is no tying arrangement because the contract "merely required its growers to use seed which would 'produce beets having substantially the same characteristics' as beets grown from U & I seed." Since growers were free to choose any sugar beet seed meeting this requirement, U & I argues, the crucial element of a per se illegal tie-in-coercion-is absent.
 
 
 56
 U & I is correct in its assertion that "as long as 'the buyer is free to take (or purchase or sell) either product by itself there is no tying problem.' " Moore v. Jas. H. Matthews & Co., 550 F.2d at 1216 (quoting Northern Pacific Railroad Co., 356 U.S. at 6 n.4, 78 S.Ct. at 518 n.4.). The undisputed evidence proffered here however, demonstrates that U & I had never approved, in fact, any other brand of sugar beet seed despite the fact that Betaseed's HH7 variety was acceptable to U & I. U & I does not argue that no other seed was satisfactory; it merely asserts that since Betaseed was the only company that had requested approval, U & I never "had occasion to consider other varieties (except to reject) Betaseed's inferior varieties." Thus, U & I concludes that it did not actually coerce growers to buy U & I seed.
 
 
 57
 In Moore, this court rejected the notion that, as a prerequisite to finding a tie, there must be a showing of actual coercion. We expressed the view that coercion may be implied from a showing that an appreciable number of buyers have accepted burdensome terms, such as a tie-in, and there exists sufficient economic power in the tying product market. 550 F.2d at 1217. "Coercion occurs when the buyer must accept the tied item and forgo possibly desirable substitutes." Id. (citations omitted).[35] Since U & I was the only sugar beet processor in the relevant market, it is clear that latter requirement is met. We believe that there is an issue of fact as to whether or not the former requirement has been met.
 
 
 58
 There is evidence that U & I had been willing to accept the HH7 variety as part of an attempt to settle this action and that U & I did not believe that this variety would cause it financial ruin. U & I never communicated to growers its apparent approval of this variety. More importantly, aside from Betaseed's seeds, there is no evidence that U & I found unsatisfactory all other varieties except its own varieties 3 and 8; yet, U & I never approved, for the regular contract, any other company's seed. There also is evidence that growers had been dissatisfied with U & I's seed prior to Betaseed's entry into the Washington seed market. U & I subsequently improved its seed and growers attributed this to competition from Betaseed's varieties. Growers also expressed concern that once the reality of competition was removed, U & I's incentive to improve its product would dissipate.[36] If this characterization of the arrangement at bar is proved, then it would demonstrate the principal evils of tie-ins: first, the growers, as buyers, were forced to forgo "shopping around" for the product of their choice; and, second, competitors in fact were foreclosed from the market for sugar beet seeds.
 
 
 59
 Advance Business Systems & Supply Co. v. S. C. M. Corp., 415 F.2d 55 (4th Cir. 1969) illustrates that Betaseed's evidence presented the district court with a factual dispute. There, the court rejected the defendant's claim that an approved source clause saved a contract from being a tie-in. The defendant tied the sale of its service contracts to the sale of its supplies and paper. The contract stated that supplies "not approved" could not be used. In concluding that, in fact, a tie-in existed, the court stated, "(n)otably, (the defendant) has never approved any competitive paper for use in (its) machines," although the defendant knew other paper could be used. 415 F.2d at 65.
 
 
 60
 Kentucky Fried Chicken v. Diversified Packaging, 549 F.2d 368 (5th Cir. 1977), a case relied upon by U & I, also illustrates the factual dispute here. There, the court considered a defense to an alleged tie-in based on lack of coercion. The Kentucky Fried Chicken's (KFC) franchise agreements required the franchisee to purchase various supplies and equipment from KFC or from sources KFC approves in writing. The agreement provided that KFC's approval would not be unreasonably withheld. If a franchisee wanted to obtain supplies from a source not previously given approval, KFC required that the supplier submit samples for testing.
 
 
 61
 In upholding the district court's finding that coercion, "a question of fact," was absent, the reviewing court noted that the franchise agreements permitted the franchisees to purchase supplies from any source that KFC approved in writing and that, at the time of trial, there were ten approved sources from which to obtain supplies. 549 F.2d at 376-77. Significantly, franchisees could recommend additional sources and, by agreement, this approval could not unreasonably be withheld. "Of crucial importance" was the fact that KFC had never refused a request to approve a supplier. 549 F.2d at 373. Consequently, the franchise agreement did not require franchisees to take the tied product-supplies-from Kentucky Fried Chicken in order to obtain the tying product-the franchise. In fact, the franchisees need not have purchased any supplies from KFC. In concluding that there was no factual basis for finding a tie-in, the court noted that if it had been proved that Kentucky Fried Chicken in fact coerced franchisees into purchasing supplies from it, instead of approved sources, the per se tie-in doctrine would have applied.
 
 
 62
 The court's analysis included an examination of whether, on its face, the approved source arrangement, presented the principal evils associated with tie-ins: foreclosure of competitors in the tied market and denial to buyers of the advantages of shopping around to obtain the best product. Although competitors were subjected to an approval requirement, the record contained no showing that this requirement had, in practice, the effect of foreclosing competitors in the supplies market because KFC had never refused a request for approval of any competitor. Similarly, the franchisees retained the option to shop around for the best product. While the option was limited to approved sources, there were ten such sources and franchisees could nominate additional ones whenever they were found. Hence, the approved source arrangement did not present the principal evils of tie-ins that are the basis for applying the per se rule.
 
 
 63
 It appears that, on its face, the arrangement before us is different from the arrangement described in KFC. There, the agreement provided that franchisees could suggest sources for approval and such approval could not be unreasonably withheld. Sources had been approved and no request for approval had ever been refused. Here, the agreement allows growers to use other companies' seeds if it can be shown by "tests satisfactory to (U & I)" that seed is "substantially similar" to U & I's seed. U & I never approved any other companies' seed, even though it admitted that Betaseed's HH7 variety was acceptable. In writing, U & I informed growers that only U & I seed could be used for the 1976 crop because no other seed company had submitted tests for seed approval. After Betaseed submitted its data U & I informed growers that Betaseed's test results revealed that it was not substantially similar to U & I's seed and therefore could not be used by growers. Although U & I had data on other companies' seeds, it did not mention this data.
 
 
 64
 There also appears to be a difference between the instant case and Kentucky Fried Chicken in terms of the underlying rationale for the other source clause. In Kentucky Fried Chicken, the court reasoned that the approved source clause protected KFC's goodwill and enabled quality control. As a franchisor, its reputation depended on its franchisee's performance. The trademark of a franchisee is relied upon by the public, and hence poor quality in goods sold by a single franchisee reflects upon the remaining franchisees as well as the franchisor. As a franchisor, KFC was entitled to insist upon reasonable standards. The counterclaimant neither contested this entitlement nor challenged the reasonableness of the standards set by KFC.
 
 
 65
 In the instant case, U & I's rationale for the clause was that it was necessary to prevent financial ruin. As a sugar beet processor forced to accept a skewed scale of payment, which was based on its own seed, U & I asserts that it was entitled to and had to adopt standards for using other companies' seeds under the skewed payment scale. Unlike the counterclaimant in Kentucky Fried Chicken, Betaseed contests this entitlement and the reasonableness of the standards adopted by U & I. While in Kentucky Fried Chicken, the underlying rationale for the clause-protection of good will and quality control-was not the subject of dispute, here it is the focus of the dispute. We next examine this factual dispute in the context of U & I's asserted business justification defense, bearing in mind that Betaseed has the burden of establishing a prima facie case of coercion.
 
 2. Justification
 
 66
 U & I asserts that it has a legitimate business interest in preventing the financial ruin of its business that would have resulted had U & I purchased, pursuant to the skewed payment scale, sugar beets with low-sugar-content grown from Betaseed's seeds. U & I asserts both that it was forced to adopt the skewed scale and that it agreed to the scale because it was based on the reliable genetic characteristics of its own seed. To further its legitimate business objective, U & I contends it had no method less burdensome to commerce, save that adopted in the regular contract, since the WSBGA refused to approve the alternate contract. The alternate contract contained a payment scale based on the characteristics of Betaseed's seed. According to this scale, growers received less money for the same amount of beets than under the regular contract's payment scale.
 
 
 67
 Betaseed first asserts that this justification, insofar as it depends on the act of another, is legally insufficient. Secondly, as discussed earlier, Betaseed maintains that the following is factually disputed: (1) whether the WSBGA forced U & I to adopt the skewed scale; (2) whether U & I agreed to the scale based on the reliability of its seed's characteristics; (3) whether U & I adopted the restriction because it believed Betaseed's seed is inferior to U & I seed and would cause it financial ruin; and (4) whether Betaseed's seed is in fact inferior to U & I's seed. Finally, Betaseed argues that the contract clause cannot be construed as a good faith use specification clause because it lacks objective standards for comparing U & I's seeds to competitors' seeds.
 
 
 68
 Betaseed correctly states that U & I cannot insulate itself from liability by claiming that it was forced into the illegal conduct by another party. E.g., United States v. Loew's, Inc., 371 U.S. 38, 51-52, 83 S.Ct. 97, 105, 9 L.Ed.2d 11 (1962) (fact that guarantor of loan required defendant to obtain the tie-in did not constitute a defense). Calnetics Corp. v. Volkswagen of America, Inc., 532 F.2d 674, 682 (9th Cir.), cert. denied 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976) (the involuntary nature of one's participation in a conspiracy to monopolize is no defense; an antitrust conspirator can be liable although participation is involuntary). Unlike the defendants in these cases, U & I does not argue that WSBGA forced it to adopt the challenged illegal activity. Rather, U & I asserts that the WSBGA forced it to agree to the skewed payment scale and that therefore, this business or industry circumstance, coupled with the knowledge of Betaseed's inferior seeds, left U & I no other choice but to adopt the challenged contract provision.
 
 
 69
 In our view, the fact that U & I does not attempt to defend its actions by asserting that the WSBGA forced it to adopt an illegal tie-in distinguishes the case at bar from Loews and Calnetics. We agree with the court's observations in Dehydrating Process Co. v. A. O. Smith Corp., 292 F.2d 653, 655 (1st Cir.), cert. denied, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961), that articles though physically distinct may be related through circumstances. The sound business interests of a seller or processor, or a substantial hardship apart from the loss of a tie-in sale, may be such a circumstance.
 
 
 70
 In Dehydrating Process, a manufacturer of storage equipment sold a patented silo and a patented unloader separately until customers expressed dissatisfaction with the unloader which had been purchased separately from the silo. This led the manufacturer to condition the sale of the unloader on the sale of its installation of the unloader in an already owned or presently purchased silo. The manufacturer, however, did not require that purchasers of its silos also purchase its unloaders. The court upheld the practice, noting that if other silos were made to defendant's specifications so that the unloader would properly function, then that policy requiring the use or purchase of its own equipment, as distinguished from others, may have been improper.
 
 
 71
 Here, whether or not the skewed scale of payment is "a fact of market life," remains a question of fact. U & I and the WSBGA apparently initially negotiated for the scale before 1973, when the contract required growers to use only U & I seed. U & I points to evidence that in subsequent negotiations, growers would not agree to change the scale of payment, while Betaseed points to evidence that, in later years, the growers agreed to a change in exchange for other concessions. Betaseed also refers to evidence that U & I did not begin requesting a change in the payment scale until 1976. Betaseed also points to evidence that the genetic characteristics of U & I seed are neither predictable nor reliable. Thus, Betaseed argues, this was not the reason why U & I initially agreed to the scale.
 
 
 72
 Betaseed maintains that, rather than attempting to prevent financial ruin after discovering the alleged inferiority of Betaseed's seeds, U & I adopted these provisions because it had become concerned about Betaseed's penetration of the seed market. Betaseed points to evidence that U & I had been monitoring Betaseed's sales and that U & I had formally studied the potential profits from sugar beet sales just prior to offering growers the alternate contract. Both parties refer to evidence of record to support their respective positions as to the inferiority of Betaseed's seed and whether U & I would suffer financial ruin from purchasing such beets under the regular contract. It is not the role of this court to resolve the issues of credibility and fact in favor of either party: these issues must be resolved on remand at a trial in the district court.
 
 
 73
 Betaseed also maintains that, given the unreliability of U & I's seed as evidenced by the great variance in results obtained from one year's production of seed to the next, U & I's contract contained an illusory seed substitute specification clause. Other companies could not possibly comply with the clause, which permitted the use of a competitor's seed if it was substantially similar to U & I seed, if they could not be sure which type or year of U & I's seed was to be the basis of comparison. Consequently, competitors would be discouraged from submitting data. Betaseed also refers to admissions by U & I officers that U & I never developed any objective procedure for deciding whether competing seeds would be acceptable under the regular contract.
 
 
 74
 U & I asserts that whether or not it developed objective standards is irrelevant because Betaseed's seed is inferior to the seed of U & I. This argument presupposes that the skewed scale of payment was a fact of market life-a fact that remains disputed at this juncture. If it is determined by the trier of fact that U & I could have adopted an unskewed payment schedule, then the alleged inferiority of Betaseed's seeds, in terms of qualities important to a sugar beet processor, loses its significance. As U & I's own documents show, what a sugar beet grower deems important in a sugar beet seed is different from that of a sugar beet processor.[37] There is evidence in the record that many growers viewed Betaseed's seed as superior to U & I's seed.
 
 
 75
 Relying on Moore v. Jas. H. Matthews & Co., 550 F.2d 1207, 1217 (9th Cir. 1977) and Siegel v. Chicken Delight, Inc., 448 F.2d 43, 50-52 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), U & I attempts to characterize the regular contract as one that provides reasonable guidelines and specifications for the use of substitute seed. In both Siegel and Moore, this court rejected the proferred quality control justification to a tie-in because each defendant had available to it an alternative which was less restrictive to competition than the tie-in: reasonable specifications for the use of a substitute. Moore involved several cemeteries that tied the sale of cemetery lots with the requirement that purchasers of markers buy the memorial from or through the cemetery and use the installation service of the cemetery. We refused to justify the tie-in on quality control grounds because the cemeteries could control the quality of markers and the appearance of the cemetery grounds by specifying the types of markers to be used and by giving reasonable guidelines for their installation. We quoted the Supreme Court's admonition that: " 'The only situation ... in which the protection of good will may necessitate the use of tying clauses is where specification for a substitute would be so detailed that they could not practicably be supplied.' Standard Oil Co. of California v. United States, 337 U.S. 293, 306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 ... (1949) (emphasis added)." 550 F.2d at 1217.
 
 
 76
 In Siegel, a franchisor tied a franchise agreement with a requirement that franchisees purchase from it equipment, mixes, and packaging. We upheld the district court's finding that factual issues existed as to whether effective quality control could be achieved by specification in the case of cooking machinery, the dip, and spice mixes. In our view, whether specification under the circumstances was practicable was a question properly presented to the jury, which had found against the defendant. 448 F.2d at 51. We also upheld the district court's ruling as a matter of law that since the admissions in evidence clearly demonstrated that the packaging was easily specifiable, quality control could not be a justification for the tie.
 
 
 77
 U & I posits that its contracts contained the kind of reasonable specification clause implicitly approved by this court in Siegel and Moore. Our reading of Siegel, however, leads us to the conclusion that the trier of fact should resolve whether specification under the circumstances was practicable and if so, whether the regular contract's seed clause is a reasonable specification of the type of substitute seed that could be used by growers.
 
 
 78
 In conclusion, we believe that reasonable persons could differ as to their interpretation of the facts and the inferences drawn from these facts. Consequently, we are unable to determine, as a matter of law, that either party's position is correct; the resolution of this matter is a task for the trier of fact. If the fact finder determines that, due to business circumstances, U & I was forced to agree to the skewed payment scale, then the questions of whether or not Betaseed's seed is inferior and whether or not the regular contract provided a reasonable guideline as to the use of a substitute seed must be answered. Before concluding that the challenged practice here does or does not warrant condemnation as a per se tie-in, the trier of fact must resolve the disputed facts to decide first whether the practice was coercive, second whether it was justified by legitimate business objectives and third, whether these objectives could have been achieved in a manner less restrictive to competition.[38]
 
 IV. RULE OF REASON CLAIM
 
 79
 Conduct which does not meet the per se requirements may still constitute a violation of the Sherman Act Section 1 rule of reason. Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 500, 89 S.Ct. 1252, 1257, 22 L.Ed.2d 495 (1969); Phonetele, Inc., 664 F.2d at 738; Kentucky Fried Chicken, 549 F.2d at 380. "Contrary to its name, the Rule does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. Instead, it focuses directly on the challenged restraint's impact on competitive conditions." National Society of Professional Engineers v. United States, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). The inquiry mandated by the rule of reason is whether challenged agreement is one that promotes competition or one that suppresses competition; "(t)he true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition ..." Id. at 691, 98 S.Ct. at 1365 (quoting Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918)).
 
 
 80
 In determining whether a restraint is unreasonable, the court must consider whether the intent of the restraint is anticompetitive and whether the restraint has significant anticompetitive effects. Sherman v. British Leyland Motors Ltd., 601 F.2d 429, 449 (9th Cir. 1979) Under this rule, the fact finder weighs all the circumstances of the case to determine whether a restrictive practice is illegal. Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). The burden of proving unreasonable effects rests with the antitrust plaintiff.
 
 
 81
 In this respect it is important to note that Container (the antitrust counterclaimant) bears the burden of proof; we are now analyzing quality control as an element of Container's claim that the approved-source provision is an unreasonable restraint of trade. We must emphasize the distinction between quality control as an affirmative defense to a per se tying violation-with the defendant bearing the burden of proof and having to establish that the tie-in is the least burdensome method for effectively controlling quality-and quality control as a factor in determining whether the defendant's conduct accords with the rule of reason. We deal here with the latter situation. Kentucky Fried's reliance on the quality control rationale therefore is not necessarily misplaced solely because less burdensome alternatives for controlling quality are available. The presence of such alternatives is a factor to be considered in the reasonableness analysis, but it is not necessarily the decisive factor. Container has failed to establish that Kentucky Fried's system is not a reasonable means of controlling quality. (footnote omitted).
 
 
 82
 549 F.2d at 381.
 
 
 83
 U & I does not dispute that the reasonableness of a restrictive practice is a paradigm fact question, see Norfolk Monument Co., Inc. v. Woodlawn Memorial Gardens, Inc., 394 U.S. 700, 702-703, 89 S.Ct. 1391, 1392-1393, 22 L.Ed.2d 658 (1969), or that summary judgment is inappropriate in antitrust cases where motivation, intent, and purpose are in issue. See, e.g., Poller v. Columbia Broadcasting Co., 368 U.S. at 473, 82 S.Ct. at 491. Defendant's principal authority, Kentucky Fried Chicken, was an appeal from a judgment entered after trial. U & I maintains that Betaseed has not offered evidence to show that the restrictive seed clause was used by U & I to affect competition adversely in any market and that Betaseed failed to offer evidence to rebut U & I's showing that the restriction was a reasonable means of controlling the quality of beets it processed. U & I asserts that no matter what theory Betaseed relies upon, the case turns only on the inferior quality of Betaseed's beets.
 
 
 84
 In Kentucky Fried Chicken, the plaintiff failed to meet its burden of proving unreasonable effect because (1) it had not presented any evidence of the actual competitive effect; and (2) the evidence demonstrated that the challenged practice's benefits outweighed its detriments. With respect to the first reason, the court noted that "(f)or all that appears in this record, competition among suppliers of the franchisees is as open and vigorous as it would be under a system in which (KFC) exerted no control at all over the franchisees." 549 F.2d at 380. KFC had not excluded a single supplier from the market, it had merely set standards that the products had to meet. The defendant did not challenge the reasonableness of the standards KFC set or that KFC had the right to establish such standards. In marked contrast, Betaseed challenges U & I's justification for establishing standards and also whether those standards are reasonable. Moreover, it is apparent from the record that, with the exclusion of Betaseed from the market, U & I has no competition from other seed companies.
 
 
 85
 With respect to the second reason, the court reasoned that the plaintiff had failed to meet its burden of demonstrating unreasonableness because the evidence disclosed that the benefits of the practice outweighed the detriments. "Even if a franchisor's conduct adversely affects competition, the conduct does not contravene the rule of reason if it is designed to control the quality of the franchisee's product and if the gain in quality is more beneficial than the attendant detriment to competition." 549 F.2d at 380. The court found that, because the quality of a franchisee's products undoubtedly affects KFC's reputation and future success, and because the plaintiff offered no evidence to support its claim that the quality control program was a sham, the plaintiff failed to prevail on its section one rule of reason claim.
 
 
 86
 In reaching this conclusion, the court observed that the record before it did not allow a determination of whether or not Kentucky Fried could control quality in any way having less potential for anticompetitive abuse. Id. at 381 n.12. Here, however, the record contains evidence that in areas outside of Washington, U & I had purchased all sugar beets, whether grown from U & I seed or not, according to an unskewed scale of payment. Of course, whether or not this alternative was available to U & I in the relevant market, is disputed.
 
 
 87
 Further, Betaseed points to evidence of anticompetitive purpose and intent that renders the reasonableness of U & I's practices a fact question. To demonstrate anticompetitive intent, Betaseed points to evidence of U & I's monitoring of its seed sales and the timing of U & I's enforcement of the restrictive clause vis-a-vis Betaseed's competitive success. U & I instructed its field personnel to keep track of Betaseed's seed sale, and then undertook a study of potential profits to be made in selling beet seed. The report of this study, expressly prepared for the "development of (U & I's) policy on use of seed from sources outside our company,"[39] indicated that "competition from other seed sources (was) keen and unless improved varieties (were) developed substantial coverage (would) be lost to other varieties." Id. This report was prepared in 1976, prior to U & I's enforcement of the seed restriction clause and to U & I's offer of an alternate purchase contract. After U & I notified growers that it would not purchase sugar beets grown from Betaseed's seed except pursuant to an alternate contract, which the WSBGA had threatened to enjoin and therefore might not be binding on U & I, growers cancelled their seed orders from Betaseed.
 
 
 88
 In Greyhound Computer Corp., Inc. v. IBM Corp., 559 F.2d 488, 505 (9th Cir. 1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978), this court noted that the fact that the company expressed concern over increasing competition and took actions which made it more difficult for others to compete presented a jury question of intent. Again in Program Engineering, Inc. v. Triangle Publications, Inc., 634 F.2d 1188, 1196 (9th Cir. 1980), this court noted that, despite the apparent legitimacy of defendant's actions, viewing the evidence in the light most favorable to the plaintiff, there was a genuine issue of material fact as to whether the acts would substantiate a violation of the antitrust laws, because the timing of the violation raised the inference of motive for such a violation. The timing of the actions here may raise similar issues of motive and intent that are not appropriate for summary resolution.
 
 
 89
 Similarly, as evidence of anticompetitive effect, Betaseed points to its own destruction and the absence of other competitor's entry into the market. Betaseed notes that from 1972 to 1975, while no restrictive provision was enforced by U & I, Betaseed entered the seed market, in which previously only U & I seed had been sold, and gained a 16 percent market share. In 1976, Betaseed had orders from growers worth almost $300,000 amounting to 20 percent of the market. After U & I notified growers that it would enforce the restriction, growers cancelled their orders, and U & I returned to its status as sole seller of sugar beet seed in the market.[40]
 
 
 90
 As we observed in De Voto v. Pacific Fidelity Life Insurance, Co., (De Voto II), 618 F.2d 1340, 1345 (9th Cir.), cert. denied, 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980).
 
 
 91
 The Supreme Court has stated that the appropriate focus in determining reasonableness under section 1 focuses on "the percentage of business controlled, the strength of the remaining competition, (and) whether the action springs from business requirements or purpose to monopolize. United States v. Columbia Steel Co., 334 U.S. 495, 527, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948) (quoted in Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 615, 73 S.Ct. 872, 884, 97 L.Ed. 1277 (1953)).
 
 
 92
 It is the last factor-the business justification defense-that U & I relies on to refute Betaseed's showing of anticompetitive purpose and effect. Viewing the evidence and reasonable inferences drawn therefrom in the light most favorable to Betaseed, we are unable to determine as a matter of law that U & I's practice does not contravene the rule of reason. Given the factual issues with respect to U & I's alleged coercive reciprocal dealing, its justification for the challenged practice, and whether it had available to it a method of accomplishing its objective that was less restrictive to competition, summary judgment on the rule of reason claim must be reversed.
 
 V. THE SECTION TWO CLAIM
 
 93
 In general, a section two monopoly claim requires two principal elements, in addition to antitrust injury: (1) possession of monopoly power in the relevant market and (2) wilful acquisition or maintenance of that power. Phonetele Inc. v. American Telephone & Telegraph Co., 664 F.2d at 739; Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc., 627 F.2d 919, 924 (9th Cir. 1980), cert. denied, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). A monopolist may not invidiously use its power in one market even if lawfully acquired, to harm competition in another market. Phonetele Inc. v. American Telephone, 664 F.2d at 739. Monopoly power is the power to control prices or exclude competition, Greyhound Computer Corp. v. International Business Machines, Inc., 559 F.2d 488, 496 (9th Cir. 1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978) (quoting United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956)); Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 272 (2nd Cir. 1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) (quoting E. I. du Pont de Nemours & Co.).[41]
 
 
 94
 Wilful acquisition or maintenance of monopoly power means that the monopolist must have "engaged in 'willful' acts directed at establishing or retaining its monopoly, 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident'." California Computer Products v. International Business Machines Corp., 613 F.2d 727, 735 (9th Cir. 1979) (quoting United States v. Grinnell Corp., 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)).[42] A defendant may protect itself against a charge of wilful monopolistic conduct by the same showing of reasonableness relative to a tying charge. Phonetele, Inc., 664 F.2d at 740.
 
 
 95
 Betaseed maintains that the relevant markets are the sugar beet purchasing and sugar beet seed markets in the eastern part of the state of Washington. Betaseed characterizes U & I's actions as both an extension of its monopoly power in the beet purchasing market to the beet seed market and as protection of its monopoly in the sugar beet seed market. There is evidence that U & I was the sole sugar beet processor and also virtually the sole seller of sugar beet seed until 1972 when Betaseed began its sales. From 1972 to 1975, U & I's purchase contracts did not contain any restrictions on seed. After three years of Betaseed's growth, U & I adopted the seed restriction in 1975 and enforced it in 1976. As a direct result of the seed restriction, Betaseed argues, it could no longer compete.
 
 
 96
 U & I does not dispute that it has monopoly power in the relevant market. U & I refutes that it wilfully maintained that power by pointing to evidence of a legitimate purpose for the seed restriction and of its superior product. As noted previously, whether the restriction was justified and whether U & I's seed was superior are disputed facts.
 
 
 97
 As in Calnetics v. Volkswagen Inc. of America, 532 F.2d 674 (9th Cir.), cert. denied, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976), the key contested issue here is motive or intent. There, this court concluded that the plaintiff should have an opportunity to let the jury draw its own inferences from the undisputed facts unless all reasonable inferences from those facts could be drawn to defeat plaintiff's claims. Despite cogent evidence of independent reasons for the defendant's cessation of business with the plaintiff, this court concluded it could not be said that no reasonable jury could have found that the defendant participated in a conspiracy in restraint of trade. Similarly here, viewing the evidence in a light most favorable to Betaseed, it cannot be said that a reasonable jury could not have found that U & I wilfully maintained a monopoly in the sale of sugar beet seeds by excluding competition. Therefore, the judgment on the section two monopolization claim must be reversed.
 
 VI. COMMON LAW CLAIMS
 
 98
 The basis for Betaseed's disparagement claim is that U & I instructed its sales personnel before they were to solicit orders for seeds, that Betaseed varieties produced beets with inferior sugar content and processability without corresponding advantages to growers. The exhibit that Betaseed cites as evidence of this is a memorandum, dated March 8, 1976, from Gene Peterson to U & I fieldmen. The memorandum informs the fieldmen of U & I's two contract policy with respect to the 1976 sugar beet crop and that the U & I regular contract will be used "only where 100 percent U & I seed is to be planted for the entire acreage covered by the contract."[43] The first paragraph of the memorandum contains Betaseed's evidence of disparagement:
 
 
 99
 During the past few years Betaseed company has conducted a sales program, which in some areas has encouraged the use of Betaseed, until it has become a large enough part of the beets delivered to have a definite detrimental effect on beet storage and sugar recovery. This has resulted in an additional economic burden on the company, with no real benefit to the grower.
 
 
 100
 U & I maintains that the district court properly granted summary judgment because U & I's president, Duane Melling, acknowledged in his deposition that he did not know of any specific false statement about the quality of Betaseed's seeds. With respect to the statements in the quoted memorandum, U & I maintains that they were accurate, based on Betaseed's own test data. Since all of the statements were either true or privileged, U & I asserts, it was entitled to summary judgment, citing Getchell v. Auto Bar Systems Northwest, Inc., 73 Wash.2d 831, 440 P.2d 843 (1968).
 
 
 101
 Defamatory words which prejudice a profession are actionable unless they are true or privileged. Getchell, 440 P.2d at 848. As discussed earlier, whether or not both of Betaseed's varieties were inferior is disputed. U & I has admitted that HH7 would be acceptable under the regular contract, yet the memorandum does not distinguish between these varieties. Whether or not the purchase of sugar beets grown from Betaseed's HH22 variety under the regular contract would have been an economic burden to U & I also is disputed. Viewing the evidence in Betaseed's favor, summary judgment was improper.
 
 
 102
 Betaseed also maintains that the district court improperly granted summary judgment on its claim of tortious interference with contractual relations. U & I urges that the district court's ruling was proper because a purchaser, such as U & I, cannot be compelled to buy an inferior product at a premium price. U & I characterizes its refusal to purchase sugar beets grown from Betaseed's seeds as privileged because it was a good faith attempt to protect its business from the economic loss which would have resulted if it had purchased the Betaseed beets under the regular contract.
 
 
 103
 In Singer Credit Corp. v. Mercer Island Masonry, Inc., 13 Wash.App. 877, 538 P.2d 544, 549 (1975), the court stated that those who in good faith assert a legally protected interest of their own which they believe may be impaired by the performance of a proposed transaction are not guilty of tortious interference with contractual relations. The burden of showing privilege for interference rests on the interferor. Calbom v. Knudtzon, 65 Wash.2d 157, 396 P.2d 148, 152 (1964). The issue is whether, under the circumstances of the particular case, the interferor's conduct is justifiable. Id. (citing Restatement (Second) of Torts § 767).
 
 
 104
 Whether or not U & I's conduct was justifiable under the circumstances remains a disputed issue of material fact. Consequently, summary judgment on this claim must be reversed.
 
 VII. U & I's COUNTERCLAIM
 
 105
 U & I claims that the district court improperly granted summary judgment on its counterclaim for price-fixing. The basis for the counterclaim is U & I's view that Betaseed and the WSBGA conspired to force U & I to purchase lower quality Betaseed beets at the same price as the higher quality U & I beets, and to restrain U & I's sale of seed.
 
 
 106
 The district court concluded that summary judgment was appropriate because U & I could not prove any damages as a result of the conspiracy and because the facts of the counterclaim did not give rise to a price-fixing claim. We agree.
 
 
 107
 Between 1972 to 1975, U & I's sugar beet purchase contracts did not contain any restriction and U & I accepted sugar beets grown from any seed, including Betaseed's seed. Thus, as the district court correctly found, U & I cannot claim any damages for these years. In 1975, U & I did not enforce the adopted seed restriction; consequently, damages for this year also are not appropriate. In 1976, after U & I enforced its seed clause, growers cancelled their orders for seed from Betaseed and Betaseed no longer was a significant factor in the Washington seed market. Although Betaseed sold some seed during 1978 to 1980, this was pursuant to the alternate contract, which did not contain the skewed scale upon which U & I bases its counterclaim. More importantly, during the earlier years when only the regular contract was offered by U & I, U & I did not keep records of the amount of sugar beets grown from U & I seed. Since U & I did not offer evidence of any damages from the alleged conspiracy, the district court properly granted summary judgment. Cf. Purex Corp. v. Procter & Gamble Co., 664 F.2d 1105 (9th Cir. 1981) (this court held that even if an acquisition had anticompetitive consequences, the plaintiff could not recover unless it established that it suffered injury from the anticompetitive effects of the acquisitions).
 
 
 108
 We also agree with the district court that because U & I failed to allege an adverse impact on competitive conditions in general, the counterclaim should be dismissed. See Gough v. Rossmoor Corp., 585 F.2d 381, 389 (9th Cir. 1978), cert. denied, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979) (under a rule of reason analysis, the practice "must first be established to be a restraint on competition and this involves a consideration of impact of restraint on the competitive conditions within the field of commerce in which the plaintiff was engaged and upon those commercially engaged in competition within it").
 
 
 109
 To obviate the need to show an injury on the competitive process, U & I attempts, without any citation of authority, to characterize various actions of the WSBGA and Betaseed as a per se price-fixing conspiracy. To support its theory, U & I offers the following conclusions: Betaseed and the WSBGA combined to mislead growers about the fairness of U & I's alternative contract; Betaseed and the WSBGA conspired to push formation of 'joint seed committee' empowered to approve seed varieties over U & I's objections; and WSBGA members, encouraged by Betaseed and the WSBGA, injured U & I by delivering Betaseed beets pursuant to the regular contract.
 
 
 110
 The evidence offered to support the alleged combination to mislead growers about the fairness of its alternate contract consists of a letter dated January 13, 1978 from Betaseed's president to a WSBGA officer. In the letter, Betaseed's president praised the "Manitoba rules" for a two-contract system of purchasing beets. A copy of the rules was attached. Two months later, Betaseed wrote growers describing U & I's two-contract system as discriminatory. One month later, a WSBGA officer wrote the WSBGA board of directors that it should take action to approve only one contract. From this, U & I concludes that although Betaseed's president and the WSBGA officer knew the feasibility of a two-contract system such as Manitoba's, they nevertheless orchestrated a campaign against such a system in Washington so that U & I would be forced to accept Betaseed beets under the regular contract.
 
 
 111
 U & I does not argue that its two-contract system is the same as the Manitoba system. That the WSBGA officer and the president of Betaseed may have known of the feasibility of the Manitoba system does not mean that they orchestrated a campaign against U & I's system merely because a WSBGA officer urged the WSBGA to adopt a one-contract system and the president of Betaseed informed growers that U & I's two-contract system was discriminatory.
 
 
 112
 The evidence of the conspiracy to form a joint seed committee to approve seed over U & I's objection consists of discussions between the president of Betaseed and two WSBGA directors about the possibility of forming a joint seed committee; and efforts of these groups through the joint committee "to force" U & I to accept Betaseed varieties under the regular contract which U & I did not do.
 
 
 113
 Evidence that the WSBGA and Betaseed encouraged growers to injure U & I by delivering Betaseed beets pursuant to the regular contract consists of U & I's assertion that "quite a number" of growers used Betaseed in 1976, in breach of the regular contract, and of Betaseed's requests in 1976 and 1977 for WSBGA help in locating growers to plant strip tests (adjoining strips of different seed planted in a single field). Here, Betaseed contends that this evidence shows that it did not invite growers to plant its seed under the regular contract, but merely in strips for tests.
 
 
 114
 Viewing the evidence in a light most favorable to U & I, we conclude the alleged anticompetitive actions here simply do not constitute a per se conspiracy to fix the price of sugar beets. That Betaseed and the WSBGA developed a joint committee to attempt to secure U & I's acceptance of Betaseed's seeds under the regular contract can hardly be construed as "naked restraint" without any purpose except stifling competition. Broadcast Music v. C. B. S., 441 U.S. at 20. Similarly, that growers violated their contracts with U & I by growing sugar beets from Betaseed's seed neither shows that Betaseed and the WSBGA encouraged them to do so, nor shows that the WSBGA and Betaseed conspired to fix the prices of beets or restrain the sale of U & I seed. U & I's evidence simply fails to show the existence of an agreement and the circumstantial evidence of business behavior here precludes such an inference. See Interstate Circuit Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939).
 
 
 115
 In Interstate Circuit Inc., a group of motion picture distributors, at the request of two large first-run exhibitors, simultaneously imposed identical restrictions on subsequent showings of the films they distributed. These restrictions had the effect of forcing subsequent run exhibitors to raise their admission prices substantially in the direction of the prices charged by the competing first-run exhibitors who requested the imposed restrictions. Other restrictions were imposed with similar anticompetitive effect.
 
 
 116
 Although there was no direct evidence showing that the distributors agreed among themselves to impose identical restrictions, each distributor knew that all other distributors had been approached with the same proposal and that the imposition of the restriction would be feasible only if adhered to by all distributors. It was also shown that the identical action taken had the likelihood of increasing profits to each distributor. From these facts, the Court held that a tacit agreement to restrain competition between the distributors could be properly inferred. The reason that absence of direct evidence of agreement was not fatal is that the distributors all had the same motive to enter into a tacit agreement. Compare Program Engineering, Inc. v. Triangle Publications, Inc. 634 F.2d 1188, 1195 n.8 (9th Cir. 1980) (evidence of letter regarding a possible copyright infringement, defendant's refusal to sell plaintiff's product, and alleged conversations among conspirators to deny access to plaintiff to sell its product was insufficient to infer agreement or conspiracy to destroy plaintiff's business).
 
 
 117
 At best, U & I has shown that Betaseed and the WSBGA wanted other seed varieties to be approved under the regular contract. This court recently noted in Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc., 637 F.2d 1376, 1386-87 (9th Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981) that even if, for purposes of a summary judgment motion, drawing all inferences in favor of the nonmoving party, the defendants' acted jointly, this concert of action does not mean that the nonknowing party's version of the facts justify application of a per se rule. The use of a per se rule can only be justified if, drawing all reasonable inferences in favor of the nonmoving party, the challenged conduct clearly had, or was likely to have, a pernicious effect on competition and lacked any redeeming virtue. Absent these effects, the failure to show that the conduct had a substantial adverse effect on competition in the relevant market-which is the claimant's burden-is fatal and summary judgment is proper. U & I has failed to make this showing.
 
 
 118
 Assuming U & I's version of the facts is true, there is no viable legal theory under U & I's version of the facts which would entitle it to judgment as a matter of law. Bushie v. Stenocord Corporation, 460 F.2d 116, 119 (9th Cir. 1972). Therefore, the district court properly granted summary judgment.
 
 CONCLUSION
 
 119
 The district court erred in granting summary judgment against Betaseed's § 1 and § 2 and its common law claims. Therefore, its judgment on those claims is reversed and the case is remanded for further proceedings consistent with this opinion. The district court properly granted summary judgment against U & I on its price-fixing claim and therefore that portion of the court's judgment is affirmed. The judgment of the district court is AFFIRMED in part and REVERSED in part and the case is REMANDED.
 
 
 
 [1]
 On appeal Betaseed has not challenged the summary judgment against its state law claims or its section 2 claims of attempt to monopolize and conspiracy to monopolize. Consequently, we do not address these claims. The WSBGA is not a party to this appeal
 
 
 [2]
 Brief for Appellee/Cross-Appellant at 7 (citing CR 58 P 4). "The midpoint on the scale (where U & I neither over paid nor underpaid relative to the extractable sugar value of the beets) was set at approximately the long run average sugar content of all U & I beets delivered to U & I's two factories in Washington." Id. (citing CR 58 P 5)
 
 
 [3]
 Funk deposition CR 112 at 38
 
 
 [4]
 Deposition Exhibit p. 507
 
 
 [5]
 Betaseed's sales for the years 1973 through 1978 are as follows:
 Year Total Washington Total Sales Washington Sales
---- ----- ---------- ----------- ----------------
 Sales Sales HH7 Variety HH7 Variety
 ----- -----
 HH22 HH22
 Variety Variety
---------------------------------------------------------
1973 120,235 33,641 11,558 999
1974 304,607 58,170 15,777 2,044
1975 369,667 78,780 73,862 24,981
1976 563,597 7,898 20,747 419
1977 225,759 2,704 30,568 71
1978 244,784 11,896 110,578 3,988
 Betaseed's answer to U & I interrogatory Nos. 10 & 11 Exhibits A & B.
 
 
 [6]
 CR-90 Broadhead deposition at 13-14, 18-21
 
 
 [7]
 According to U & I's officials, the alternate contract payment scale was based on scientific data about the sugar content and purity of beets grown from Betaseed's seed; the scale reflected the "lower value" of HH22 to U & I. Affidavit of Charles Whipple P 7. CR 58. The price per ton for beets paid to the grower was reduced across the board. Betaseed calculated that growers would receive more money using its seeds pursuant to the alternate contract than using U & I seed under the regular contract. Affidavit of Maddux Exhibit 1 CR 64. The marketing agreement between the WSBGA and the individual grower, however, required the grower to enter into only a WSBGA-approved contract. CR 64 Deposition Exhibit 101
 
 
 [8]
 Affidavit of Keith Wallentine CR 59 P 7. Dr. Kent Nielsen, manager of Agricultural Research, was responsible for sugar beet variety testing at U & I. The combined results of replicated variety tests done by U & I showed that, from 1972 to 1976, Betaseed's HH22 had a significantly lower percentage of sugar than did U & I's 8. The sugar percentage of Betaseed's HH7 was lower than U & I 8 for the years 1972 and 1974 and this was a statistically significant difference in 1972 and 1974. In 1975, however, HH7's sugar percentage was higher than that of U & I 8. In 1976, HH7 was again lower in terms of sugar percentage but this was not statistically significant. He concluded that U & I's 8 higher percentage of sugar was statistically significant as to HH22 but not as to HH7. Late in 1974 or early in 1975, he informed the U & I management of his opinion. He again so informed them in late 1975 or early 1976. Nielsen Affidavit, CR 60 PP 5, 9, 12
 It is important to note that Nielsen did not compare U & I 3 to HH7 and HH22. This is significant because the contract required non U & I seed to produce beets having characteristics substantially similar to those produced from U & I 3 and 8, yet Nielsen's tests only compared Betaseed's varieties to U & I 8.
 
 
 [9]
 Affidavit of Keith Wallentine, C.R. 59 P 6
 
 
 [10]
 Affidavit of Wallentine, C.R. 59 P 8
 
 
 [11]
 Several factors are listed: (1) over three years, U & I 8 averaged 15.54 percent sucrose as compared to 14.89 percent for HH22; (2) U & I 8 has a small top easily removed while HH22 has a rough crown and has a harder top; (3) they are comparable in terms of pounds of sugar per acre; (4) U & I 8 has higher curly top resistance than HH22; (5) U & I "will always make sure that sufficient U & I hybrid seed is available for all growers," while "it has been indicated that HH22 is in short supply;" and (6) "Hybrid 8 appears to be more resistent to Erwinia rot than HH22." Deposition Exhibit P-602
 
 
 [12]
 The profit to be gained from sugar beet sales is estimated at $1,192,190.00. The report states:
 Improved sugar beet varieties have a positive effect on the profitability of other aspects of the sugar beet industry in addition to the profit returned from the sale of seed. Sugar beet varieties with increased sucrose percentage and improved purity are more economically processed in the mill. Sugar beet varieties with increased yield of sucrose per acre and improved disease resistance maintain or improve the competitiveness of sugar beets compared to other crops.
 Deposition Exhibit P-607 (emphasis added).
 A letter dated March 7, 1973, from Nielsen, indicates that Betaseed's hybrids and U & I hybrids do not differ significantly in terms of gross sugar per acre. Deposition Exhibit P-507. In the replication variety tests pooled for 1973, 1974 and 1975, however, HH22 was significantly higher than U & I in yield of sucrose tons per acre. Deposition Exhibit P-607.
 The table listing the economics of different sugar beet varieties to the sugar beet industry contains a conclusion that HH22 would result in a $1,121,400.00 loss per year while U & I 8 would net a $240,600.00 profit per year. Deposition Exhibit P-607
 Results of 1973 Idaho strip tests attached to the report list HH22 and HH7 as lower than U & I 8 and U & I 3 in terms of gross sugar and percent sucrose. They yield more tons per acre than U & I 3 but fewer tons per acre than U & I 8. In the Idaho-Aberdeen variety tests, HH7 and HH22 were higher than U & I 8 and U & I 3 in terms of sucrose yield (tons/acre) and beet yield (tons/acre), but lower in terms of percent sucrose.
 In commercial tests pooled for Washington locations for 1975, HH22 had a higher yield of sucrose and tons per acre but a lower percentage sucrose than did U & I. The lower percentage sucrose was determined to be significant. HH7 was significantly higher than U & I 8 in terms of yield of sucrose (tons/acre) and tons per acre but significantly lower than U & I 8 in terms of percentage of sucrose.
 
 
 [13]
 Deposition Exhibit P-607
 
 
 [14]
 Id
 
 
 [15]
 Id
 
 
 [16]
 The letter states:
 It is surely not the intent of the Company to restrict growers from using the seed obtained from other sources if that seed meets the criteria outlined and this can be demonstrated by suitable tests. No scientific data has been received for evaluation, and thus in response to requests for a determination as to the seed that can be used for the coming season ..., U & I will limit 1976 purchase of beets only to those beets grown from U & I Hybrids Three and Eight until such time as it is demonstrated by tests to the Company's satisfaction that other beet seeds possess as good or better characteristics as the Hybrids Three and Eight.
 Deposition Exhibit 62 (emphasis in original).
 
 
 [17]
 The stated subject of the letter is the "Seed To Be Used In 1976." HH22 is described as: (1) having excellent early vigor but not demonstrating "any overall ability to produce more sugar per acre than U & I 8; (2) producing more tons of beet per acre than U & I 8 but having a lower sugar content; (3) producing a double crown making proper storage more difficult; (4) causing additional production costs; (5) being more susceptible to curly top disease than "several other commercial varieties"; and (6) being more costly to process, handle, and fume. Deposition Exhibits P-507, P-572
 
 
 [18]
 The improvements are described as:
 It has been recognized by the Company that two or three years ago the foreign material in our seed was excessive. The Company has since installed the latest equipment available to correct this problem. These changes have resulted in production of exceptionally debris free seed.
 Last year the Company, in the spirit and interest of progress, started using a coloring agent on its seed to facilitate the location of the seed in the ground. This materially aids in the determination of planting depth and seed spacing. The coloring agent was applied to the seed at rates that were too high with subsequent flaked off of the coloring material and accumulation of the material in the bottom of the seed hoppers. (sic) In some instances this caused growers to empty and clean the seed hoppers more frequently than they may have felt desirable. To correct this undue flaking of coloring agent for seed processed in 1976, the amount added was reduced and application of heat was used to fix the color to the seed.
 In addition, the seed was screened immediately prior to bagging to remove any remaining coloring agent ...
 Deposition Exhibit P-507.
 
 
 [19]
 Deposition Exhibit P-65. Peterson also explained that there would need to be an adjustment in the scale of payment for U & I to accept Betaseed's seeds
 Betaseed's replicated tests compared its HH22 and HH7 to U & I 8. HH22 was lower than U & I 8 in terms of sugar percentage in all four of the tests and HH7 was lower in three of the four tests. In all four tests, HH22 had a higher amount of pounds of extractable sugar per acre, pounds of gross sugar per acre, and tons of beets per acre than did U & I 8.
 For two tests, U & I 8 had a higher score than HH7 in terms of extractable sugar per acre, pounds of gross sugar per acre and tons of beets per acre. In two tests, HH7 scored higher than U & I 8 in these categories except pounds of extractable sugar per ton.
 In the Othello, Washington test, HH7 had a higher percentage of sucrose than did U & I 8, but HH22's sucrose was lower than U & I. In the Toppenish, Washington test, both HH7 and HH22 had lower sucrose percentage than U & I 8.
 
 
 [20]
 Deposition Exhibit P-65
 
 
 [21]
 Betaseed's answer to U & I's Interrogatory 32, Duane Melling Deposition at 45
 
 
 [22]
 Affidavit of Rowland Cannon, C.R. 57 PP 5-6; Affidavit of Keith Wallentine, C.R. 59 P 4
 
 
 [23]
 Peter Funk, past president of the WSBGA and member of the Contract Committee, stated in his deposition that U & I did not press for a change in the payment scale until 1976. C.R. 112 at 20. Joe Tukunga, another WSBGA Contract member, recalled that U & I first requested the change in 1975 or 1976. C.R. 111 at 18
 
 
 [24]
 After a February 21, 1977 presentation of a proposed new scale by U & I, the WSBGA decided they could not economically produce beets under such a scale. The association then proposed adherence to the present contract and scale and recommendation to its growers to use only U & I seed for the 1977 growing season. P-129
 
 
 [25]
 Memorandum to files from Keith Wallentine. P-613
 
 
 [26]
 Deposition Exhibit 622. The 1976 contract negotiation notes, in Betaseed's view, also call into question U & I's good faith bargaining attempt to obtain a change in the scale and evidence anticompetitive intent
 During a meeting on March 1, 1977, one of the WSBGA officers is reported to have stated that the "economics of the grower is the gist of the whole problem, that it just isn't possible for the sugar beet farmer to grow beets under the proposed scale that the company is offering." After this statement was made, "(t)here was some discussion that the company can't control the kind of seed the growers plant." It is reported that:
 Charlie Whipple (then) said that it was too bad but the Antitrust laws in the United States put them in a very bad position with keeping other types of seed out of the Washington area. Mark said the company can't legally get into a position where they are limiting those who can sell seed in the State of Washington.
 Id.
 The growers informed U & I that the payment scale's pivot point, which started at 16.091, was "just too high when (in) only (one) year in the last five has the sugar content been over 16%." The subject of the scale was then dropped from negotiation. Deposition Exhibit P-130.
 The WSBGA officer recording the minutes of another negotiations meeting described the payment scale bargaining as follows:
 (The) clause in the contract is good and that there is no reason to change it ... as a provision is made for other types of seed. (sic)
 (The company discussed the clause) and the change in the payment scale whereby "low sugar would take a beating and some adjustment in high sugar beets;" ... Pete (a U & I manager) took the position that the language in the contract is ok. Russ wanted to know what justification the company had for a change in scale and Ford said the company is prepared to make some changes trading high sugar for low. More discussion took place on the low sugar content this year where only company seed was used.
 Wallentine said that the situation as far as the seed clause is concerned leaves the company open to litigation ... Ford Scully discussed the work that is being done in the seed laboratory to breed new seed for high sugar and tonnage and that the company felt it was not good when outside sources come into the state to sell an inferior seed. Whipple took the position that a change in the scale was a good approach ...
 They were not prepared to supply any figures on any scale change proposal but wanted to discuss it. They still took the position that they must be able to select varieties of seed planted. Pete advised the company that we were opposed to any change in the scale. He and others got back on the low sugar content (of beets) this year (with use of only U & I seed). Joe pointed out that the costs involved as far as growers were concerned were just the same whether you grew a high or a low sugar beet ...
 The seed problem last year was kicked around. Nothing gained. Also the problem of planting U & I seed on germination, emergence, and what have you....
 Whipple got back on the deal that the company didn't know the legal ramifications of the problem but that seed competition was getting to be a real problem....
 Russ suggested that we take the seed clause out of the contract and Mark countered by saying that freight is quite an item of cost.... Russ said that the growers are a captive group because we have one company where we can deliver beets and also the fact that the company apparently didn't have any concern for the growers' costs during early harvest....
 The question was asked whether the company would pay more for early harvest (or) low (sugar) content beet and the group was told they wouldn't.
 Deposition Exhibit 125 (emphasis added).
 
 
 [27]
 Stander Affidavit, C.R. 29 pp. 12-14
 
 
 [28]
 Charles Whipple acknowledged that the difference between U & I 8 and HH7 was not enough to cause significant harm to U & I. C.R. 110 at 109. Charles Whipple also asserted that U & I had approved HH7. C.R. 110 at 107
 This "approval" of HH7 consists of a letter stating, "As a compromise, we have proposed that HH7 be used in the coming year provided that the evaluation of this seed is substantially the same as what we already know ... You have requested (approval of both) HH7 and HH22." p. 64 Exhibit 81 (emphasis added). This letter is a follow-up of U & I's August 20, 1976 offer to settle the instant action. The offer was made after growers had cancelled their orders for seed from Betaseed. Betaseed maintains that this letter cannot be construed as "approval" because it is equivocal and because it was not communicated to growers. We agree.
 
 
 [29]
 The example of a reciprocal dealing arrangement given by the Spartan Grain court involves one party who is both a food wholesaler and a provider of goods used in processing foods, and another party who is a food processor. The wholesaler agrees to purchase products from the food processor only on the condition that the processor buy the processing goods from it. 581 F.2d at 424. Although this is an example of coercive reciprocity, the court did not so define it. The court's analysis does not distinguish between coercive and noncoercive reciprocity
 
 
 [30]
 In De Voto v. Pacific Fidelity Life Insurance Co., 516 F.2d 1 (9th Cir.), cert. denied, 423 U.S. 894, 96 S.Ct. 194, 46 L.Ed.2d 126 (1975) (De Voto I) this court reversed summary judgment on a section one claim because there was evidence that defendants' breach of contract may have been based on factors other than traditional business considerations-that is, a corporate relationship or a business decision based on favoring corporate affiliations-and hence, presented an issue of fact as to whether defendants unreasonably intended to restrain trade. In reaching this conclusion, this court relied on two cases involving reciprocity issues: FTC v. Consolidated Foods Corp., 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965) and International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). Consolidated Foods involved a successful § 7 Clayton Act challenge to a merger on the grounds that it created a potential for reciprocity. International Salt involved a successful § 1 Sherman Act challenge to a lease agreement for industrial salt machinery that required lessees to also purchase from the lessor all salt used in the machines. The Supreme Court did not expressly refer to the practice as reciprocity or tying-in; however, the practice could be so characterized. De Voto I discussed both cases for the proposition that the use of a corporate relationship to induce another to breach a contract is an irrelevant and alien factor that may produce an anticompetitive effect. 516 F.2d at 6
 After trial on remand, the parties appealed. At the outset, we indicated that the evidence would be reviewed according to the rule of reason rather than a per se analysis because there were not sufficient grounds to conclude that business decisions based on favoring corporate affiliations automatically must be condemned. De Voto v. Pacific Fidelity Life Insurance Co., 618 F.2d 1340, 1344 (9th Cir. 1980) (De Voto II). Unlike De Voto, the coercive dealing arrangement at bar may fit the category of a per se tie-in, e.g., Gough v. Rossmoor Corp., 585 F.2d 381, 386 (9th Cir. 1978), cert. denied, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979), therefore, we are not here making additions to the limited per se list.
 
 
 [31]
 There, Royster sued Columbia for breach of contract and Columbia responded in part with an antitrust counterclaim based on reciprocal dealings. The trial judge distinguished between coercive and noncoercive reciprocity, submitting to the jury only the issue of coercive reciprocity on a per se basis. The jury returned a verdict for the defendant. On appeal, Columbia asserted that it should have been allowed to have a jury determination on the issue of noncoercive reciprocity. The Court of Appeals assumed that noncoercive reciprocity could violate the Sherman Act, but held that, as a matter of law, if parties of equal economic strength mutually participate in the formulation and execution of the scheme and bear equal responsibility, each is barred from antitrust recovery. 451 F.2d at 15-16
 
 
 [32]
 The case was brought under § 7 of the Clayton Act which prohibits acquisitions that would tend to lessen competition or create a monopoly
 
 
 [33]
 Relying on the $500,000.00 amount of sales of tied products in International Salt v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) as the lowest figure deemed not insubstantial, the court concluded that, since only $177,225.00 worth of sales was involved, there could be no recovery
 In Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (Fortner I), the Court noted that the controlling consideration in determining the not "insubstantial amount of commerce" requirement is "simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimus, is foreclosed by the tie ... Id. at 501, 89 S.Ct. at 1257. There, $90,000 satisfied the test.
 
 
 [34]
 U & I does not dispute that, since U & I maintained the only sugar beet processing facility located in or near the relevant geographic market-the sugar beet growing area centered in eastern Washington-sugar beet growers in that area had to sell to U & I. (C.R. 110 Whipple Deposition at 89-96. U & I also does not dispute that it occupied a dominant position in the market and therefore did possess sufficient economic power in the tying product market to restrain competition in the tied market. International Business Machines Corp. v. United States, 298 U.S. 131, 136, 56 S.Ct. 701, 703, 80 L.Ed. 1085 (1936); Moore v. Jas. H. Matthews & Co., 550 F.2d at 1215. Thus, the second element of the per se test is met. The third requirement, that not an insubstantial amount of commerce in the tied product market be affected, means that it cannot be de minimus. Moore v. Jas. H. Matthews & Co., 550 F.2d at 1216. U & I does not dispute that the amount of commerce attributed to Betaseed in 1976 and its almost 20 percent market share of total volume of sales, approximately $300,000, is enough to meet the third element of the test under Moore. See id. Similarly, U & I does not challenge that Betaseed suffered injury as a result of U & I's tie-in and thus the fourth element is not an issue
 
 
 [35]
 In Moore, we rejected the argument that the fact that each purchaser of a cemetery lot was not absolutely required to buy a cemetery lot marker meant that coercion had not been shown. We stated that a showing of an onerous effect on an appreciable number of buyers coupled with a demonstration of sufficient economic power in the tying market is sufficient to demonstrate coercion. 550 F.2d at 1217. Thus, coercion in the context of a tie-in means that a product sold on the condition that the buyer also purchase a different or tied product or at least that the buyer agrees not to purchase the product from any other supplier. Northern Pacific Railroad Co., 356 U.S. at 5-6 & n.4, 78 S.Ct. at 518 & n.4. "Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed." Id. at 6, 78 S.Ct. at 518. Consequently, tie-ins are "unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a not insubstantial amount of interstate commerce is affected (citations)." Id. Where the seller has no control or dominance over the tying product so that it cannot be an "effectual weapon to pressure buyers into taking the tied item" the restraint attributable to it "would obviously be insignificant at most." Id
 Northern Pacific demonstrates these principles. There, the Court stated that the undisputed facts established beyond any genuine question that the defendant possessed substantial economic power by virtue of its extensive landholdings. The defendant used this power as leverage to induce large numbers of purchasers and lessees to give it preference, to the exclusion of its competitors, in transporting goods or produce from the land defendant transferred to them. In disposing of its holdings the defendant had entered into contracts of sale or lease covering several millions of acres of lands. The "very existence" of these contracts, which contained " 'preferential routing' clauses" was "itself compelling evidence of the defendant's great power, at least where, as (there), no other explanation had been offered for the existence of these restraints". Id. at 7-8, 78 S.Ct. at 519 (footnote omitted). The preferential clauses, the court explained, did not confer any benefit on the purchasers or lessees-"they got the land they wanted by yielding their freedom to deal with competing carriers, ..." Id. at 8, 78 S.Ct. at 519. The defendant's purpose, in the Court's view, "obviously was to fence out competitors, to stifle competition." Id. The Court noted that while it may have been beneficial to defendant's business, it was "the very type of thing (that) the Sherman Act condemns." Id. The Court concluded that the arrangement was a per se tie-in.
 In reaching this conclusion, the Court discussed its earlier decision in International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). There the defendant refused to lease its salt dispensing machines unless the lessee also agreed to purchase from the defendant all the salt it used in the leased machines. The court affirmed the summary judgment in favor of plaintiff because it was " 'unreasonable, per se, to foreclose competitors from any substantial market' by tying arrangements.... 'By contracting to close this market for sale against competition, International (Salt) ha(d) engaged in a restraint of trade for which its patents afford(ed) no immunity from the antitrust laws.' " Northern Pacific Railroad Co., 356 U.S. at 9, 78 S.Ct. at 520 (quoting International Salt, 332 U.S. at 396, 68 S.Ct. at 15).
 The Northern Pacific Railroad Court again discussed International Salt in rejecting defendant's argument that its preferential routing clauses did not significantly restrain competition because they permitted the vendee or lessee to ship by a competing carrier if its rates were lower or if its services were better than defendants. The Court first observed that if, as defendant had contended, these restrictive provisions were harmless with no tendency to restrict competition, "it is hard to understand why (defendant) has expended so much effort in obtaining them in vast numbers and upholding their validity, or how they are of any benefit to anyone, even the defendant." Id. at 12, 78 S.Ct. at 521. The Court reasoned that "however that may be," the essential fact remained that the agreements were binding obligations "held over the heads of vendees" which denied competitors access to the "fenced-off market on the same terms as the defendant." Id. The Court then referred to a similar argument proffered by the defendants and rejected by the Court in International Salt. The defendant there argued the restraint was not offensive because it allowed lessees to buy salt from other suppliers when they offered a lower price than that of defendant.
 The Northern Pacific Railroad quoted from International Salt:
 " '(That exception) does, of course, afford a measure of protection to the lessee, but it does not avoid the stifling effect of the agreement on competition. The appellant had at all times a priority on the business at equal prices. A competitor would have to undercut appellant's price to have any hope of capturing the market, while appellant could hold that market by merely meeting competition. We do not think that this concession relieves the contract of being a restraint of trade, albeit a less harsh one than would result in the absence of such a provision. 332 U.S. at 397 (68 S.Ct. at 15)."
 356 U.S. at 12, 78 S.Ct. at 521.
 
 
 [36]
 The minutes of a contract negotiating session between the WSBGA and U & I contain various references to this fact. When the company advised the WSBGA that Betaseed must prove that its seed is as good as U & I seed several WSBGA members reportedly took issue with U & I:
 (They) stated that the seed that was put out prior to a couple of years ago was a bunch of crap with a lot of dirt and foreign material so that it was difficult to handle through a regular drill bit and that the company didn't do anything about cleaning up their seed until Betaseed came into the picture.
 (Then there was) some discussion of the Great Western seed and the fact that it doesn't have the curly top resistance other seeds have. Mark advised the company they can't legally shut out other kinds of seeds....
 Mark again got back on the idea that the company must have a solution to the seed problem ... and that they must get the scale back in shape to meet the economic problem they are confronted with....
 Again more discussion in favor of Betaseed in 1975 and before as being cleaner and a better seed to plant....
 Questions were asked why the company's # 8 seed had more bolters and what this did to the sugar content. There didn't seem to be any answers.
 Deposition Exhibit P-130 (emphasis added).
 At another meeting, after Charles Whipple from U & I reportedly said that "seed competition was getting to be a real problem," WSBGA members "discussed the problem that they had up until about a year or two ago with the company seed being so dirty ... and that the only time the company cleaned up the seed was after they had competition from other seed companies." U & I then brought up Betaseed and said it was their burden to show whether its seed is as good as U & I. "Russ suggested we take the seed clause out of the contract ... (and) that the growers are a captive group because we have but one company where we can deliver beets." Deposition Exhibit P-125.
 
 
 [37]
 The text of a talk given by Kent Nielsen from U & I indicates that the seed characteristics important to a grower are those that yield the highest possible production of sugar per acre. Growers are paid on both yield and sucrose content which makes high production of sugar per acre "of foremost importance" to growers. The genetically controlled factors which insure this in a crop are rapid high emergence, frost resistance, and good seedling vigor. The sugar processor, according to Nielsen, "is concerned with purity and extractable sucrose, or sugar content." "A sugar factory is for one purpose and that is to manufacture sugar. This can best be done when the beets have few impurities and a high percentage of sucrose content." Deposition Exhibit P-507
 From a grower's standpoint, Betaseed asserts, the test data indicate that Betaseed seed, which in U & I's view gives greater yield and gross sugar at the expense of extractable sucrose content, is better. U & I counters that its "seed" is superior to Betaseed from the point of view of both a processor and a grower.
 The minutes of a U & I-WSBGA contract meeting indicate that growers thought Betaseed was cleaner and a "better seed to plant." Deposition Exhibit P-130.
 
 
 [38]
 Betaseed bears the burden of establishing a prima facie case of a coercive reciprocal dealing. If this is accomplished the burden shifts to defendant to prove that the challenged practice was justified by legitimate business objectives which could not be achieved in a manner less restrictive to competition. See Phonetele, Inc., 664 F.2d at 739
 
 
 [39]
 Deposition Exhibit P-607
 
 
 [40]
 C.R. 114, Answers to Interrogatories Nos. 11, 12, and 36, U & I Interrogatories to Betaseed, First Set. C.R. 112 Funk Deposition at 148
 
 
 [41]
 Size is an earmark of monopoly power and the existence of monopoly power may be inferred from the predominant share of the market. Greyhound Computer Corp. v. International Business Machines, Inc., 559 F.2d 488, 496 (9th Cir. 1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978) (quoting United States v. Griffith, 334 U.S. 100, 107 n.10, 68 S.Ct. 941, 946 n.10, 92 L.Ed. 1236 (1948)). There, this court noted that if the jury concluded the defendant possessed monopoly power in the relevant market (leasing of general purpose computers), the defendant would be precluded from employing otherwise lawful practices that unnecessarily excluded competition
 
 
 [42]
 Once a firm gains a measure of monopoly power, whether by its own superior competitive skill or because of such actions as restrictive combinations with others, it may discover that the power is capable of being maintained and augmented merely by using it. As the Second Circuit explained in Berkey Photo v. Eastman Kodak Co., 603 F.2d 263, 274 (2d Cir. 1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), a firm that has achieved dominance of a market might find its control sufficient to preserve and even extend its market share by excluding or preventing competition: "A variety of techniques may be employed to achieve this end-predatory pricing, lease-only policies, and exclusive buying arrangements, to list a few."
 The court also noted that the mere possession of monopoly power does not ipso facto condemn a market participant; but to avoid "the proscriptions of § 2, the firm must refrain at all times from conduct directed at smothering competition." Id. at 275. A firm may not use its market position as a lever to create a monopoly in another market.
 
 
 [43]
 Deposition Exhibit P-501